737 So.2d 520 (1999)
Osvaldo ALMEIDA, Appellant,
v.
STATE of Florida, Appellee.
No. 89,402.
Supreme Court of Florida.
July 8, 1999.
Rehearing Denied August 30, 1999.
*521 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
SHAW, J.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Osvaldo Almeida. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse the conviction and vacate the death sentence.

I. FACTS
Chiquita Counts was found shot to death outside a Days Inn hotel in Fort Lauderdale on October 13, 1993. Two other murders took place in Broward County within a monthone in Sunrise (Frank Ingargiola) and one in Fort Lauderdale (Marilyn Leath)and police suspected that all three were related. Sunrise police took Almeida into custody on November 29, 1993, questioned him concerning the Ingargiola murder, and notified Fort Lauderdale police that they had arrested a suspect in the murders. Almeida confessed to the Sunrise Police that he had committed the Ingargiola murder and later confessed to the Fort Lauderdale Police that he had committed the Leath and Counts murders.[1] He was charged with and convicted of first-degree murder for the killing of Counts. The court followed the jury's nine-to-three vote and sentenced him to death based on one aggravating circumstance,[2] two statutory mitigating circumstances,[3] and several nonstatutory mitigating circumstances.[4]
Almeida raises seventeen issues on appeal,[5] but we find a single claim dispositive. *522 Almeida was picked up by police November 29, 1993, and was taken to headquarters where he was questioned beginning at 5:16 p.m. He initially was read his rights and signed a waiver form. Several minutes later, in response to questioning by Detective Mink he made a brief inculpatory statement concerning an unrelated killing, i.e., the murder of Frank Ingargiola (Almeida said simply, "I fucking killed him."). At that point, Detective Mink prepared to conduct a formal recorded session. Officers turned on the tape recorder at 5:30 p.m. and the following discussion transpired:
Q. Do you mind if we call you Ozzie during this, or do you prefer your own name?
A. That is okay.
Q. Ozzie's okay?
A. Okay.
Q. Can you read and write the English language?
A. Can I read English?
Q. Can you read and write the English language?
A. Yes.
Q. Did you graduate high school?
A. No, not yet. I was still finishing.
Q. All right. Prior to us going on this tape here, I read your Miranda rights to you, that is the form that I have here in front of you, is that correct? Did you understand all of these rights that I read to you?
A. Yes.
Q. Do you wish to speak to me now without an attorney present?

A. Well, what good is an attorney going to do?

Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q. (By Detective Allard) We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
Q. (By Detective Mink) Ozzie, this is a statement taken in reference to an incident that occurred at in front of Higgy's on November 15th, 1993, in the morning hours. Where the night manager by the name of Frank Ingargiola was shot in the parking lot, directly out in front of Higgy's. In your own words can you tell me what took place on this night and your involvement in this?
A. Yes. Me and a couple of friends went to Higgy's after work.
Almeida then confessed again to the Ingargiola murder and later in the same session confessed to another unrelated murder (i.e., the killing of Marilyn Leath) and to the present murder (i.e., the killing of Chiquita Counts).
The State contends that Detective Mink was not required to answer Almeida's question concerning counsel ("Well, what good is an attorney going to do?") before continuing the interrogation. The State argues that this issue is controlled by State v. Owen, 696 So.2d 715 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997). We disagree.

II. STATE v. OWEN

This Court in Long v. State, 517 So.2d 664, 667 (Fla.1987), held that if in the course of custodial interrogation a suspect makes an utterance that may be an attempt to invoke his or her rights, police may "continue questioning for the sole purpose of clarifying the equivocal request." Subsequent to Long, the United States Supreme Court in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), held that if a suspect initially waives his or her rights, the suspect thereafter must clearly invoke those rights during the ensuing interview. That *523 Court based its ruling on the following rationale:
[T]he primary protection afforded suspects subject to custodial interrogation is the Miranda warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." [Moran v. Burbine, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).] A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted.
Davis v. United States, 512 U.S. 452, 460-61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). This Court was then faced in State v. Owen, 696 So.2d 715 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997), with the issue of whether to adopt the Davis rationale in Florida.
The defendant in Owen had initially waived his Miranda[6] rights and during the ensuing interrogation session made two equivocal statements. First, when one of the detectives asked whether he had deliberately targeted the victim's house, Owen responded, "I'd rather not talk about it." Later, when the officer asked him where he had put a bicycle, Owen said, "I don't want to talk about it." In both statements it was unclear whether Owen was referring to the immediate topic of discussion, i.e., the house and the bicycle, or to the underlying right to cut off questioning. Officers did not stop to clarify either statement. The district court affirmed the trial court's order suppressing the confession but certified to this Court a question asking whether Davis was applicable in Florida. This Court answered in the affirmative and held as follows:
Thus, we hold that police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights.
Owen, 696 So.2d at 719. We quashed the district court decision.
The impetus underlying our decision in Owen was that the "equivocal request" standard announced in Long had proven unworkableit placed "too great an impediment upon society's interest in thwarting crime." Owen, 696 So.2d at 719. Custodial utterances are extraordinarily rich in diversity and include not only statements affirmatively invoking a suspect's rights but also statements prefatory to the invoking of a right. Police under Long were required to stop an interview and clarify each such statement that was equivocal in any way. This rule resulted in otherwise admissible confessions being suppressed based on the most tenuous statements. In Owen, we were confronted with an utterance of the first type, i.e., a statement allegedly invoking a right, and our ruling was simple: In such a case, the suspect must invoke the right clearly.[7]
That issue is not presented in the instant case. Here, we are confronted with a custodial utterance that was prefatory toand possibly determinative ofthe invoking of a right. In analyzing the present utterance, we first must ascertain whether Almeida was in fact referring to his right to counsel. As noted above, Detective Mink asked Almeida, "Do you wish to speak to me now without an attorney present?" and Almeida replied, "Well, what good is an attorney going to do?" Almeida's utterance was made under the following conditions: (1) at the very beginning of the taped interrogation session; (2) in the *524 midst of a general discussion concerning his rights; and (3) in direct response to a police question concerning the right to counsel. In light of these circumstances, it is indisputable that the defendant was referring to his right to counsel.[8]
We next must determine whether the utterance was a bona fide question whichunder normal circumstances would call for an answer. The audio taped version of the encounter sheds further light on the exchange. On the tape, Almeida had answered each of the preceding questions without hesitation and without equivocation, and then, when asked the above question, he came to an abrupt halt, paused for many seconds (about 5 seconds on the tape), and made a pensive, probing response: "Well ... [pause] ... what ... [another pause] ... good is an attorney going to do?" It was a genuine question. It was not a rumination or a rhetorical question.[9] Almeida was seeking a frank answer. The officers, however, ignored the question and never attempted to give an answer.
This scenario is not embraced within our holding in Owen. The type of utterance at issue in Owen was an equivocal statement whichpursuant to Davisrequired no clarification and could not trump the clear waiver of rights Owen had made earlier. The type of utterance at issue here, on the other hand, was an un equivocal question that was prefatory toand possibly determinative ofthe invoking of a right and which cast doubt on the knowing and intelligent nature of the prior waiver. Detective Mink plainly asked Almeida if he wanted to proceed without a lawyer, and Almeida just as plainly asked the officer what good a lawyer would do. There was nothing equivocal about this exchange and certainly nothing unclear about Almeida's questionit was a simple, direct question, susceptible of but a single interpretation. Almeida very clearly was asking the officer for fundamental information concerning his right to counsel.

III. TRAYLOR v. STATE

This Court nearly a century and a half ago defined the abiding standard for determining the admissibility of a confession. Officers are not allowed to delude the suspect as to his or her rights or to exert a coercive influence:
To render a confession voluntary and admissible as evidence, the mind of the accused should at the time be free to act, uninfluenced by fear or hope. To exclude it as testimony, it is not necessary that any direct promises or threats be made to the accused. It is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to this true position, and exert an improper and undue influence over his mind.

Simon v. State, 5 Fla. 285, 296 (1853) (emphasis omitted and added).
The Court subsequently in Traylor v. State, 596 So.2d 957 (Fla.1992), set forth a series of guidelines for use in Florida similar to those announced in Miranda *525 that were designed to ensure the voluntariness of confessions. The Court expressly addressed the right to counsel:
Under [article I, section 9, Florida Constitution], if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin, or, if it has already begun, must immediately stop. If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present, or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiated interrogation on any offense throughout the period of custody unless the lawyer is present....
Traylor, 596 So.2d 966 (emphasis added). A statement obtained in violation of this proscription cannot be used by the State. Id.
The Court in Traylor thus held that if a suspect indicates in any manner that he or she wants the help of a lawyer the interrogation must cease. This proscription necessarily embraces a scenario such as the present, for the defendant here was seeking basic information on which to make an informed decision concerning his right to counsel. No valid societal interest is served by withholding such information. Indeed, both sides can only benefit from disclosure: Disclosure ensures that any subsequent waiver will be knowing and intelligent, and it reaffirms those qualities in a prior waiver.[10] Nondisclosure, on the other hand, is doubly harmful: It exacerbates the inherently coercive atmosphere of the interrogation session, and it places in doubt the knowing and intelligent nature of any waiverwhether prior or subsequent.
Accordingly, we hold that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwisei.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspectis to actively promote the very coercion that Traylor was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State. See Traylor, 596 So.2d at 966.
In the present case, we conclude that Detective Mink should have made an honest effort to answer Almeida's question concerning his right to counsel. Both Almeida and the State would have benefitted from the dissemination of basic, common sense information concerning this right. Instead, by ignoring the question and continuing the interrogationi.e., by "steamrolling" the defendantthe officers did two things. First, they exacerbated the inherently coercive atmosphere of the interrogation session. (How could Almeida feel free to exercise his rights when police had just overridden his question concerning those rights?) And second, they placed in doubt the validity of the prior waiver. (How could Almeida have knowingly and intelligently waived his rights earlier if he did not know "what good ... an attorney [is] going to do?")

IV. CONCLUSION
Custodial interrogation is an extraordinarily useful and important practice that can make or break a trial prior to the trial's inception. Our holding today works hand-in-hand with our decision in Owen in *526 defining a few basic rules governing custodial utterances. We held in Owen that police must honor a clear statement invoking a suspect's rights. See generally Owen, 696 So.2d at 719. We hold today that police similarly must answer a clear question concerning a suspect's rights. These twin rulings establish an unmistakable bright line for law enforcement. We recognize, of course, that no rigid set of guidelinesno matter how simple or clearwill work in every case. Accordingly, when enforcing the above standards, Florida courts should bear in mind several overarching principles.
First, the raison d'etre of the interrogation room is to promote society's quest for the truth, and the only permissible means to achieve this end is in conformity with the law. The constitution both state and federalhas focused the bright light of the law on this heretofore dark room. Article I, section 9, Florida Constitution, requires that whenever a suspect's rights are clearly raised in the interrogation roomwhether by police or the suspectofficers must pursue the matter in an open and forthright manner. In such a situation, gamesmanship of any sort by the officers is forbidden. Second, as we noted in Traylor, "the state's authority to obtain freely given confessions is not an evil, but an unqualified good." Traylor, 596 So.2d at 965. Imperfections and technical flaws will inevitably occur in the course of any interrogation, but a court should not suppress a confession based on a trivial or insubstantial violation. In sum, whenever constitutional rights are in issue, the ultimate bright line in the interrogation room is honesty and common sense.
Based on the foregoing, we conclude that the trial court erred in admitting Almeida's inculpatory statement. On the present record, we are unable to say beyond a reasonable doubt that the error did not contribute to the verdict.[11]See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla. 1986). We reverse the conviction and vacate the death sentence.
It is so ordered.
ANSTEAD and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
HARDING, C.J., dissents with an opinion, in which WELLS, J., and OVERTON, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which OVERTON, Senior Justice, concurs.
HARDING, C.J., dissenting.
I respectfully dissent. The issue in this case is clear: whether the law enforcement officials in this case were required to stop and clarify Almeida's statement, "What good is an attorney going to do." Both this Court and the United States Supreme Court have recently established a rule dealing with this issue. To resolve this case, this Court need only apply this rule.

FACTS
The record reveals that Almeida was picked up by the Sunrise Police and questioned regarding the Frank Ingargiola murder. Detectives Mink and Allard were present during the interrogation session. As was the normal practice, Almeida's interrogation consisted of two parts: an initial, unrecorded interview in order to get everything in perspective and a subsequent recorded interview. Detective Mink read Almeida his Miranda rights prior to the unrecorded interview. Almeida orally waived these rights. Almeida also signed a written waiver form. Almeida proceeded to confess to the Ingargiola murder. Following the preliminary interview, the detectives turned on the tape recorder. At the beginning of the taped interview, Detective Mink again reminded Almeida of his rights, including his right to an attorney. The following transpired:

*527 Q [Detective Mink]. Prior to us going on this tape here, I read your Miranda Rights to you, that is the form that I have here in front of you, is that correct? Did you understand all of these Rights that I read to you?
A [Almeida]. Yes.
Q. Do you wish to speak to me now without an attorney present?
A. Well, what good is an attorney going to do?

Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q [Detective Allard]. We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
(Emphasis added.) Almeida again confessed to the Ingargiola murder during the taped interview. After the Ingargiola interrogation ended, detectives from Fort Lauderdale arrived and questioned Almeida regarding the murders of Marilyn Leath and Chiquita Counts. The Fort Lauderdale detectives questioned Almeida about the two murders in separate interrogation sessions. Prior to both sessions, a Fort Lauderdale detective clarified that Almeida had been read his Miranda rights and that he had in fact waived those rights. In both sessions, Almeida acknowledged that he was aware of his rights and that he had waived those rights. Almeida proceeded to confess to murdering both Leath and Counts. Almeida has asserted error in all three cases (Ingargiola, Leath, and Counts), based on his response, "Well, what good is an attorney going to do."

LAW
The law in Florida has recently changed regarding when an officer must stop an interrogation session to clarify a request. In Long v. State, 517 So.2d 664 (Fla.1987), this Court held that if a defendant makes an equivocal request, the officer may continue questioning only for the sole purpose of clarifying the request. At the time, the Long rule mirrored the federal standard.
However, this rule requiring clarification apparently caused confusion and resulted in valid confessions being suppressed due to ambiguous responses from defendants, where it was not clear what right, if any, the defendant was asserting. Therefore, in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court clarified the rule and established a bright-line test. According to Davis, once a defendant waives his or her Miranda rights, an officer is not required to clarify a suspect's subsequent equivocal request for counsel and may continue questioning a suspect until the suspect makes a clear assertion of the right to counsel. In fact, the Court stated, "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning." Id. at 461-62 (emphasis added). The Davis rule leaves no doubt in an officer's mind regarding when the officer must stop to clarify a request-if the defendant does not make an unequivocal request for counsel, then the officer does not need to stop the interrogation.
In State v. Owen, 696 So.2d 715 (Fla. 1997), this Court was asked whether the Florida Constitution creates a different standard from the federal constitution regarding a suspect's rights under Miranda. This Court adopted the rule in Davis and held that "Florida's Constitution does not place greater restrictions on law enforcement than those mandated under federal law when a suspect makes an equivocal statement regarding the right to remain silent." Id. at 720.

ANALYSIS
Accordingly, by applying the rule announced in Davis and Owen, this Court need only ask whether Almeida's statement was an "unequivocal request for *528 counsel."[12] The majority makes several attempts at defining the precise content of Almeida's statement.[13] I question whether the majority's categorizing is correct, or even necessary. Whatever Almeida's statement was, I know what it was notit was not an "unequivocal request for counsel."[14] Therefore, under Davis and Owen, the police were under no obligation to stop the questioning.[15]
*529 Further, if the majority is going to engage in categorizing Almeida's statement, then it should at least adhere to the established judicial procedures on the subject. In the present case, Detective Mink did not consider Almeida's statement to be a request. Rather, Detective Mink characterized Almeida's statement as "a comment, not a question." Additionally, the trial court ruled that Almeida's statement was "no more than a rhetorical question at best." The trial court concluded that even under the old Long standard, Almeida's remark did not even rise to the level of an equivocal request requiring clarification.
"A trial court's ruling on a motion to suppress comes to this Court clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." San Martin v. State, 717 So.2d 462, 469 (Fla.1998); see also Escobar v. State, 699 So.2d 984, 987 (Fla.1997). The trial court's ruling will be upheld if supported by the record. See Rhodes v. State, 638 So.2d 920, 925-26 (Fla.1994). In the present case, Detective Mink's testimony supports the trial court's finding that Almeida's statement was "no more than a rhetorical question."
Additionally, the question as to whether Almeida's statement was an equivocal request is not a question of law but rather a question of fact.[16] As such, this Court should give deference to the trial court's finding of fact and not substitute it's judgment for the trial court's on this point. See Gardner v. State, 480 So.2d 91, 93 (Fla.1985).
In United States v. Mills, 122 F.3d 346 (7th Cir.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 637, 139 L.Ed.2d 615 (1997), the Seventh Circuit Court of Appeals addressed a similar scenario. In Mills, the defendant was arrested and placed in the back of a squad car. An officer read the defendant his Miranda rights and the defendant stated that he understood his rights. The officer then gave the defendant a written waiver form and asked him to sign it. The defendant responded, "Get the f___ out of my face. I don't have nothing to say. I refuse to sign." Approximately two hours later, the defendant was again read his rights and again he said that he understood his rights. At this interview, he proceeded to make an incriminating statement. The defendant asserted that his statement in the back of the squad car was an invocation of his right to remain silent. The circuit court held:
Historical facts are the appropriate domain of the trier of fact, and our review of such findings is deferential. The magistrate judge heard the evidence and determined that Mr. Mills' statement in the squad car on the way downtown was not a clear assertion of his right to be silent but rather a general expression of anger. See United States v. Banks, 78 F.3d 1190, 1196-97 (7th Cir.1996). This *530 determination of the precise content of the message Mr. Mills communicated is a matter upon which we must defer to the trial court. The determination is essentially one of fact: Under the totality of the circumstances, what was the message that Mr. Mills wished to convey?

122 F.3d at 350 (emphasis added). Other courts in this country have recognized this principle of giving deference to a trial court's finding of fact in the area of Miranda warnings. See United States v. D.F., 115 F.3d 413, 416 (7th Cir.1997) ("An appeals court, emphasized the Supreme Court, `should give due weight to a trial court's finding that an officer was credible and the inference was reasonable.'"); Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir.1995) ("We review the district court's findings of historical fact for clear error...."); Lord v. Duckworth, 29 F.3d 1216, 1220 (7th Cir.1994) ("Ordinarily we treat a state court's conclusion as to whether a suspect invoked his Miranda rights as a finding of fact which we owe deference when reviewing a federal habeas corpus petition.").
Applying this principle to the case at bar, I believe that this Court is required to give deference to the trial court's finding that Almeida's statement was not an equivocal request but rather a rhetorical question. As the court stated in Mills, the precise content of Almeida's message is a matter upon which we must defer to the trial court. Thus, after concluding that Almeida's statement was not a request, the detectives were not required to stop and clarify this statement, even under the old Long standard.
This case is simple. Yet the majority tortures the law by distinguishing between post-Miranda comments and during-the-giving-of-Miranda comments and by differentiating between remarks which "affirmatively invok[e] a suspect's rights [and] statements prefatory to-and possibly determinative of-the invoking of a right."[17] *531 In the end, the majority brings us back to the pre-Davis era, and, as a result, law enforcement officials will be unsure as to when they must stop, when they must clarify, and when they can continue questioning. See Davis, 512 U.S. at 461 ("But if we were to require questioning to cease if a suspect makes a statement that might be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.").
Finally, I question the majority's instruction on how the officer should have responded in this case: "[W]e hold that if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." Majority op. at 525. This holding is directly contrary to the Supreme Court's statement in Davis that "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning." Davis, 512 U.S. at 461-62 (emphasis added).
In addition, it is very troubling that the majority offers no guidance as to what would be a proper response to the statement "what good is an attorney going to do." Any answer that the officer could offer would be susceptible to claims of misrepresentation or incompleteness. This point is exemplified by the case of Thompson v. Wainwright, 601 F.2d 768 (5th Cir.1979). In Thompson, the defendant "signed a waiver card and announced his desire to make a statement but added that he first wanted to tell his story to an attorney." Id. at 769. One officer informed the defendant that an attorney could not relate Thompson's story to the police while another officer stated that an attorney would probably advise the defendant to say nothing. The court concluded that the officer's remarks were improper:
[T]he limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests or not. Nor may it incorporate a presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present. Such measures are foreign to the purpose of clarification, which is not to persuade but to discern.
. . . .
... The point is that counsel's advice about what is best for the suspect to do is for counsel, not the interrogator, to give. And it is for him to give after consultation with his client and after weighing where the suspect's best interests lie from the point of view of the suspect, not from that of a policeman be he ever so well intentioned. Until this occurs, it is simply impossible to predict what counsel's advice would be; and even if it were, the right to advice of counsel surely is the right to advice from counsel, not from the interrogator.
Id. at 772. I am sure that the Supreme Court was aware of these potential pitfalls and chose to avoid them by creating the bright-line rule in Davis. Rather than adhering to the rule in Davis, the majority is muddying the once-clear waters and consequently preventing the law enforcement officials of this state from efficiently enforcing the law.
WELLS, J., and OVERTON, Senior Justice, concur.
WELLS, J., dissenting.
I dissent for the sound reasons set forth in Chief Justice Harding's concurring and dissenting opinion in Almeida v. State, No. 89,432, ___ So.2d ___, 1999 WL 506965 (Fla. July 8, 1999) (Almeida II). Furthermore, I point out that neither in this opinion nor in Almeida II does the majority explain the source of its authority to substitute its judgment for that of the trial *532 court on the issue of fact of whether Almeida was making a statement or making an equivocal request for counsel. To the contrary, the decision of the majority is directly contrary to what this Court stated as recently as June 11, 1998, in San Martin v. State, 717 So.2d 462, 469 (Fla.1998):
A trial court's ruling on a motion to suppress comes to this Court clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling. San Martin, 705 So.2d at 1345; Owen v. State, 560 So.2d 207, 211 (Fla.1990), receded from on other grounds, State v. Owen, 696 So.2d 715 (Fla.1997).
Detective Mink testified it was considered by him to be merely a statement. The trial judge believed Detective Mink, and the majority has no basis in law or fact to simply discard this determination by the trial judge in order to reach its result.
When the records of the three murders to which Almeida confessed as having committed within a month of each other are considered in total, it is inescapable that the new majority's reformulated analysis and application of State v. Owen, 696 So.2d 715 (Fla.1997), forces a decision which is unjust, unnecessary, and inappropriate.
OVERTON, Senior Justice, concurs.
NOTES
[1] Almeida gave the following details concerning the Counts murder: On the night of the murder, he asked Counts, who was a prostitute, for sex; Counts entered the front seat of his car and performed a sexual act on him; afterwards, Counts asked Almeida to drop her off at a Days Inn hotel; once they arrived at the hotel, Counts asked for more money than she had initially agreed upon; when Almeida refused, Counts exited the car and insulted him; before driving away, Almeida called Counts over to the driver's side of the car and shot her once in the chest.
[2] The court found that Almeida had been convicted a prior capital felony, i.e., the murder of Marilyn Leath.
[3] The court found the following statutory mitigators: Almeida was extremely disturbed; and Almeida was nineteen at the time of the crime.
[4] The court found the following nonstatutory mitigators: Almeida has a capacity for rehabilitation; Almeida exhibited good behavior while incarcerated; Almeida cooperated with police when arrested; Almeida voluntarily gave statements concerning the crime; Almeida has a history of alcohol abuse; Almeida was physically, emotionally, and sexually abused as a child; Almeida has shown remorse; and Almeida has exhibited genuine religious beliefs.
[5] Almeida makes the following claims: (1) the trial court erred in denying his motion to suppress due to his equivocal request made during the giving of Miranda rights; (2) the trial court erred in denying his motion to suppress because the Miranda warnings were given for an interrogation involving a separate victim, not the victim in this case; (3) the trial court erred in denying his motion for mistrial; (4) the trial court erred in ruling that the State had a right to introduce his statement regarding a collateral murder if he attempted to elicit evidence that his confession for the present crime was not voluntary; (5) the death penalty is disproportionate in this case; (6) the trial court failed to exercise discretion in evaluating the mitigating circumstances; (7) the conviction relied on as the basis for the prior violent felony aggravator has been overturned; (8) the trial court gave undue weight to the jury's recommendation of death; (9) the trial court failed to make the findings required for the death penalty; (10) the trial court erroneously applied a presumption of death; (11) the trial court erred in denying his motion for supplemental voir dire; (12) the trial court erred in failing to consider life without parole as an option and failed to instruct the jury on this option; (13) the trial court erred in allowing the State to introduce details of the prior violent felony conviction; (14) the trial court allowed the prior violent felony convictions to become a feature of the case; (15) the trial court admitted hearsay evidence in violation of his Confrontation Clause rights; (16) the trial court erred in allowing the State to elicit evidence regarding his sanity; and (17) electrocution is cruel and unusual punishment.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] As noted above, this ruling applies only where the suspect has waived the right earlier during the session. See State v. Owen, 696 So.2d 715, 719 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997).
[8] In contrast, the statements in Owen were made under the following conditions: (1) long after interrogation had begun; (2) in the midst of discussion on topics other than Owen's rights; and (3) in direct response to a police question that was unrelated to the right to cut off questioning. Under these circumstances, the likelihood that Owen was referring to his right to cut off questioning was decreased.
[9] Detective Mink testified that Almeida's question was "[a] comment, not a question," and the trial court found that the question was "no more than a rhetorical question at best. As such, it did not require a response from law enforcement." Both these views, however, are belied by the audiotape. The contents of the tape are unmistakableAlmeida asked a genuine question. The trial court had no special vantage point in reviewing this tape. Based on our review of the transcript and tape, we conclude that the record evidence is legally insufficient to support the trial court's finding. See generally Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981) ("Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.").
[10] See Traylor v. State, 596 So.2d 957, 966 (Fla.1992) ("A waiver of a suspect's constitutional rights must be voluntary, knowing, and intelligent....").
[11] Cf. Almeida v. State, No. 89, 432. ___ So.2d ___, 1999 WL 506965 (Fla. July 8, 1999) ("Almeida II") (finding admission of the same taped statement harmless in Almeida's trial for the murder of Frank Ingargiola).
[12] At the time Almeida made the statement in question, he had already been read his Miranda rights and waived those rights.
[13] The majority makes the following conclusions regarding Almeida's statement, "What good is an attorney going to do": (1) "it is indisputable that the defendant was referring to his right to counsel"; (2) "It was a genuine question. It was not a rumination or rhetorical question"; (3) "The type of utterance at issue here, on the other hand, was an un equivocal question that was prefatory to-and possibly determinative of-the invoking of a right"; and (4) "There was nothing equivocal about this exchange and certainly nothing unclear about Almeida's question-it was a simple, direct question, susceptible of but a single interpretation. Almeida very clearly was asking the officer for fundamental information concerning his right to counsel." Majority op. at 524.

The Eleventh Circuit Court of Appeals has considered two very similar statements and concluded that both were equivocal requests for an attorney. See Towne v. Dugger, 899 F.2d 1104 (11th Cir.1990) ("Officer, what do you think about whether I should get a lawyer?"); United States v. Mendoza-Cecelia, 963 F.2d 1467 (11th Cir.1992) ("I don't know if I need a lawyermaybe I should have one, but I don't know if it would do me any good at this point."). I recognize that both of these cases were decided prior to Davis.
[14] The majority infers that the mere fact that Almeida's statement was unequivocal is enough, by itself, to obligate the police to stop the interrogation. See supra n. 13. The majority fails to consider the entire holding of Davis-"If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis v. United States, 512 U.S. 452, 461-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (emphasis added). Obviously, an unequivocal statement concerning the weather is of no consequence. Likewise, an unequivocal request for a soda would have no bearing on this case. The only type of unequivocal statement that requires the questioning to cease is an unequivocal request for counsel. The unequivocal statement "What good is an attorney going to do" is not sufficient.
[15] I am concerned with the majority's disregard of the principle of precedent and this Court's previous decision in Owen, decided within the last two years. In the present case, there has been no clear showing that this Court's decision in Owen was factually or legally erroneous or that it has proven unacceptable in actual practice. Absent such a showing, this Court is obligated to follow its earlier ruling. See Perez v. State, 620 So.2d 1256, 1259-61 (Fla.1993) (Overton, J., concurring). The only circumstance that has changed since the Court issued its decision in Owen is the membership of the Court. See State v. Schopp, 653 So.2d 1016, 1023 (Fla. 1995) (Harding, J., dissenting) ("The doctrine of stare decisis provides stability to the law and to the society governed by that law. While no one would advocate blind adherence to prior law, certainly a change from that law should be principled. Where a rule of law has been adopted after reasoned consideration and then strictly followed over the course of years, the rule should not be abandoned without a change in the circumstances that justified its adoption. The only circumstance that has changed since the Court issued its decision in Smith is the membership of the Court.").

Perhaps most disturbing of all is the fact that this exact issue has already been decided by this Court! Almeida was convicted for the murder of Marilyn Leath and he appealed that conviction to the Fourth District Court of Appeal. Almeida asserted the same confession argument in the district court that he is asserting in this case. The district court reversed Almeida's conviction and certified the following question to this Court:
DO THE PRINCIPLES ANNOUNCED BY THE UNITED STATES SUPREME COURT IN DAVIS [v. UNITED STATES, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ], APPLY TO THE ADMISSIBILITY OF CONFESSIONS IN FLORIDA, IN LIGHT OF TRAYLOR [v. STATE, 596 So.2d 957 (Fla.1992)]?
Almeida v. State, 687 So.2d 37 (Fla. 4th DCA 1997). This Court held:
In State v. Owen, 696 So.2d 715 (Fla.1997), we answered this question in the affirmative. Accordingly, consistent with Owen, we quash the decision below and remand for further proceedings.
Almeida v. State (Almeida I), 700 So.2d 640 (Fla.1997). Thus, the very same issue that is before our Court today has already been decided by this Court in regard to this exact response by Almeida. Yet the majority today is disregarding that previous ruling and, in essence, changing horses in midstream. What kind of signals are we sending to the district courts of this state? The views expressed by the justices in the majority should have been expressed in Almeida I.
[16] Questions of fact involve disputes over a disputed set of facts. See Black's Law Dictionary 1246 (6th ed.1990). In contrast, questions of law concern the legal effect to be given to an undisputed set of facts. There is a factual dispute in the present case as to what Almeida meant to convey by the statement, "What good is an attorney going to do." Almeida asserts that this was a request of some form, either equivocal or unequivocal. The State argues that the statement was merely a comment, not a request. The trial judge concluded that the statement was "a rhetorical question, at best" and was therefore not an equivocal request. It is only after a judge resolves questions of fact and factual disputes that questions of law come into play, i.e., the legal principles that apply to equivocal requests vs. the legal principles that apply to mere comments.
[17] If a defendant asserts a Miranda violation pursuant to the federal constitution, then the rule announced by the Supreme Court in Davis applies: "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis, 512 U.S. at 461-62, 114 S.Ct. 2350. See also Medina v. Singletary, 59 F.3d 1095, 1100-01 (11th Cir. 1995).

Many states have adopted the reasoning of the Supreme Court in Davis and determined that their respective state constitutions do not afford an individual defendant greater protection than the federal constitution. See, e.g., People v. Crittenden, 9 Cal.4th 83, 36 Cal. Rptr.2d 474, 885 P.2d 887, 912 (1995) ("Nonetheless, as we previously have recognized, subsequent to the adoption of article I, section 28, subdivision (d) of the California Constitution, we apply federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of Miranda."); Taylor v. State, 689 N.E.2d 699, 704 (Ind.1997) ("Assuming that the same result Miranda and its progeny now require is also demanded by the Indiana constitutional right to counsel, an unequivocal request for counsel is necessary to require suppression of subsequent statements made while in custody, just as it is required by Davis to invoke the Miranda right to counsel.").
However, "[i]n any given state, the federal Constitution [] represents the floor for basic freedoms; the state constitution, the ceiling." Traylor v. State, 596 So.2d 957, 962 (Fla.1992)(citing Stewart G. Pollock, State Constitutions as Separate Sources of Fundamental Rights, 35 Rutgers L.Rev. 707, 709 (1983)). Therefore, an individual state can choose to grant a defendant more rights under its state constitution than are provided under the federal constitution. See, e.g., State v. Hoey, 77 Hawai'i 17, 881 P.2d 504, 523 (1994) ("On the issue before us, we choose to afford our citizens broader protection under article I, section 10 of the Hawaii Constitution than that recognized by the Davis majority under the United States Constitution....").
Accordingly, this Court is required to follow Davis unless we establish that our state constitution creates a greater right in this area of the law than the federal constitution. In State v. Owen, 696 So.2d 715, 720 (Fla.1997), this Court specifically stated, "Florida's Constitution does not place greater restrictions on law enforcement than those mandated under federal law when a suspect makes an equivocal statement regarding the right to remain silent." The majority's opinion disregards this precedent.