GRIFFIN, J.
The State of Florida appeals an order granting a motion to suppress. We agree that it was error to order suppression and reverse.
On July 13, 1999, the body of Michael Phillips was discovered lying on the bedroom floor of his mobile home in Lake Helen, Florida. A 911 call reporting the death was received at 1:02 p.m. Investigator Moore [“Moore”] of the Volusia County Sheriffs Office was assigned to be the lead investigator at 1:15 p.m. Moore arrived at the scene at 2:10 p.m. and interviewed potential witnesses. Among other things, he learned that a party had occurred at Michael Phillips’ mobile home the night before. The party was attended by the thirty-six year old victim; Jason R. Seaton [“Seaton”], twenty-two years old; Seaton’s eighteen-year-old girlfriend, Meghann Donovan [“Meghann”]; and three males.
Investigator Moore testified at a motion for pretrial release that Seaton became a suspect as a result of the interviews conducted on the scene. Multiple marked and unmarked police cars then went to the Seaton residence, where officers stayed for approximately an hour. Seaton and his girlfriend agreed to go to the law enforcement operations center for an interview.
Seaton signed a written waiver of his rights at the operations center. He then confessed to shooting the victim during an interview with Investigators Moore and Kunkle [“Kunkle”]. In his confession, Seaton stated that he had gone to a party at the victim’s trailer, where he and Me-ghann were drinking. He passed out after being given a huge glass of rum and ice by the victim. He was then carried inside and put to bed. Seaton said that he was still “very very drunk” when he woke up and went looking for his girlfriend. He tried the victim’s bedroom door, and, when he found that it was locked, he figured his girlfriend was inside because the victim had been “hitting on her” the night before. Seaton then went out to his truck, got his gun, went back into the trailer, and began to fire rounds through the door. He then broke down the door and emptied his gun (which contained thirteen rounds) into the victim, who had already fallen to the floor, while Meghann screamed at him to stop. *998 Seaton and his girlfriend then drove home to Seaton’s house.
Based on these events, Seaton was charged with first-degree premeditated murder. He later moved to suppress his confession on the basis that officers had failed to give an adequate response to a pre-confession inquiry he had made regarding whether he should get a lawyer before talking to police.
At the hearing on the motion to suppress, the parties stipulated to the use of a three-page transcript of a conversation Seaton had had with investigators prior to his confession concerning whether he should waive his right to counsel. The transcript read as follows:
KUNKLE: Obviously, you know, we appreciate you cornin’ in here and bein’ willin’ to talk to us and everything. I’m sure you’ve seen a lot of TV shows, and whatever, so what we’d like to do is, if you would, is talk to you and try to get some information on this. You have indicated that you wanna talk to us and help us clear this matter up, if I’m not mistaken. Is that correct?
SEATON: Yeah, I wanna clear it up.
KUNKLE: Okay.
SEATON: I don’t know how well I can do that, but....
KUNKLE: Well, the best you can, you know. What more can I say? You realize, of course, that you’re here freely and voluntarily, and that you’re under no obligation. You know, you can talk to us. If there’s somethin’ we say that upsets you, you don’t like, you don’t have to answer it, that’s all. No more, no less.
SEATON: Shouldn’t I have a lawyer with me?
KUNKLE: I’m sorry?
SEATON: Should I have a lawyer with me?
KUNKLE: That’s something I can’t tell you. That’s a decision that you make, not me. Obviously, if you want a lawyer, you have that right. In line with that, I was about to read you your Miranda Rights. If you want, you know, you got any questions after that, we’ll deal with that. But I cannot give you that advice. I mean that’s legal advice.
SEATON: Okay, I don’t know y’all, but....
KUNKLE: You’re a big boy.
SEATON: ... I trust you, for some reason.
KUNKLE: If you wanna talk to us about this, and help clear it up, you make that decision.
SEATON: Okay.
KUNKLE: If you wanna talk to us ... if you wanna talk to us with a lawyer or without a lawyer, that’s up to you.
SEATON: Alright.
KUNKLE: Okay?
SEATON: I’ll talk to y’all.
KUNKLE: Okay. What I’m doin’ is fil-lin’ out your name and everything. I’m gonna read these Rights to you, and then let you go over it and read it and sign it, initial it, whatever you wanna do.
SEATON: Okay.
KUNKLE: You’re here voluntarily. You’re doing this, and if there’s something you don’t like, tell me. You’re not gonna hurt my feelings.
SEATON: Okay.
KUNKLE: I’ve been called everything in the book, and told everything in the book, so you’re not gonna upset me, okay?
SEATON: Okay.
KUNKLE: Mark and I have been around a long time, so, you know, you’re not gonna hurt anybody’s feelings. Like I said, I know you’ve seen a lotta this on TV, so this may sound repetitious to you because of that, but you have the right to remain silent. Anything you say may be used against you in Court. You have the right to *999 talk to a lawyer for advice before we ask you any questions, and have him or her present during your questioning. If you cannot afford to hire a lawyer, of course, one would be appointed for you before questioning, if you wish. Do you desire to consult with a lawyer first, or do you want one present during this interview?
SEATON: No.
KUNKLE: Okay. That’s a “no”, is that correct?
SEATON: Yes, sir.
KUNKLE: If at any time hereafter, you wish to remain silent or have a lawyer present, all questioning will be stopped. We’ll stop right then and there at your request. Has anyone at this point in time threatened, coerced, or promised you anything in order to persuade you to make this statement you’re about to make?
SEATON: No.
KUNKLE: Okay. Do you understand your Rights as they’ve been read to you?
SEATON: Yes, sir.
KUNKLE: Okay. And you still wish to talk to us at this time?
SEATON: Yes, sir.
At the suppression hearing, Investigator Kunkle testified that Seaton was not in custody at the time of the interview. He acknowledged that Seaton was “a suspect” in the case, but was unaware whether he was the most probable suspect, as allegedly shown at the hearing on his motion for pretrial release.
Following Investigator Kunkle’s testimony, Seaton argued that the statement he gave following the above-quoted exchange should be suppressed because (1) a reasonable person in his position would have believed that they were in custody; and (2) Kunkle failed to respond to his question regarding whether he should have a lawyer, as required by Almeida v. State, 737 So.2d 520 (Fla.1999), cert. denied, 528 U.S. 1181, 120 S.Ct. 1221, 145 L.Ed.2d 1120 (2000). The trial court entered a written order granting the motion to suppress on the authority of Almeida.
We do not need to reach the first two issues presented on appeal — whether Sea-ton was in custody and whether the question posed by Seaton merely solicited the officer’s opinion, a query unprotected by Almeida.[1] Even if Almeida were applicable, the response given by Kunkle fully meets the high court’s requirement. He clearly and straightforwardly informed Seaton that the decision to have a lawyer, or not, was a decision he had to make for himself. Seaton makes two contrary arguments: first, that Almeida requires the officer to answer any such question and there is only one correct answer to the question — “yes!”. Alternatively, by telling Seaton that he “couldn’t” answer the question, Kunkle “chilled” Seaton’s exercise of his right to ask and get answers to other questions by suggesting that he had no information to impart. (“That’s something I can’t tell you.”) We do not credit either argument; rather, we conclude that Kun-kle’s response and the follow-up dialogue were open and forthright as required by Almeida. The statement that followed Seaton’s decision to speak without consulting a lawyer should not have been suppressed.
REVERSED and REMANDED.
COBB and SHARP, W., JJ, concur.

. Compare State v. Craig, 237 So.2d 737 (Fla.1970) and Norris v. State, 429 So.2d 688 (Fla.1983), with Glatzmayer v. State, 754 So.2d 71 (Fla. 4th DCA), review granted, 767 So.2d 461 (Fla.2000).