DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ZEDRIC JOSEPH,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D17-1651

[November 14, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 50-2014-CF-002657-A.

Carey Haughwout, Public Defender, and Tatjana Ostapoff, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Zedric Joseph entered his girlfriend's apartment and found her having sex with another man. He killed the man by stabbing him numerous times with a bread knife. He also held the knife to his girlfriend's throat and threatened her. She pushed it away with her hand, causing a severe laceration. She convinced him to leave, saying she would say that the incident was a robbery committed by an unknown perpetrator.

Once Joseph learned that law enforcement was looking for him, he fled. He was arrested at a hotel in Augusta, Georgia.

We write to address Joseph's challenge to the admissibility of his post-arrest statement to the police.

After Joseph was taken into custody, he was questioned by Detective Sabrina Tobey. The interrogation was videotaped and introduced at trial.

The defendant answered identifying questions and Detective Tobey read him his *Miranda*[1] rights. When she asked, "Do you have any questions on that?" he responded, "Understood 100 percent." He signed a card waiving his rights.

The detective noticed the defendant's bandaged hand. She asked him what happened. He replied "football," explaining that the university hospital looked at it. Other evidence indicated that he had injured his hand while stabbing the victim.

The detective asked him to tell her about his "crazy week," and he explained that there was a warrant out for him for something that happened in West Palm Beach and that he heard the police were looking for him. He decided to flee because he needed to find out what was going on so he would not get blindsided. During the interrogation, the defendant evaded simple questions, like when he arrived in West Palm Beach and how he got around when he was there.

Joseph told the detective he had had an on and off relationship with his girlfriend for five years, that it had been "recently good," and that they had gotten back together at the beginning of 2014. He said he did not know if they were still together.

When the detective asked why he was in handcuffs, the defendant said, "I'm hoping to find out exactly from you all." Joseph avoided giving concrete answers and instead discussed the seriousness of the situation and how no one wanted to hear his side.

Joseph denied being in the girlfriend's apartment on March 7. The detective persisted, telling him that he walked in to find his girlfriend having sex with another man. They talked about whether the detective respected him and whether she had pre-judged him. She told him that she knew he was in the apartment and asked him to tell her what he saw and what he did and *then* she would respect him.

The basis of Joseph's motion to suppress arose from the following exchange:

> Defendant: *I don't think it will be -- I don't know the word for it, but I don't think it will be, like -- I don't want to say smart, but -- 'cause I don't want to try to make it seem like I'm here trying to be slick or something. So I don't really want to use the*

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

*word smart, but **I don't think it will be something for me to be, you know, maybe discussing certain things until maybe I get a lawyer.***

*Because, like you said, when you read the rights, like, you know, what you could say or something like that. Like, I don't want to say something and then have a -- I don't know. 'Cause that's what -- that's what lawyers do, they try to use anything you say and if they could twist it, they'll twist it, if they could flip it, they'll flip it. If they can make A seem like Z, they'll make A seem like Z.*

*And I'm not -- I don't have the intellect to know, like, what I should and what I shouldn't even be saying because I -- like I said, I've never been in anything this serious before, or anything serious, for that matter, like. So, I mean, this is new to me and I really don't know --*

Detective: All right, man. Well, that's your prerogative.

Defendant: *You know what I'm saying?*

Detective: I mean, if you don't -- if you don't want to talk to me without a lawyer then I'm not going to talk to you.

Defendant: *Would you advise me to?*

Detective: I can't tell you to advise -- I can't advise you to do anything. So --

Defendant: *If you were in my shoes, would you? I mean --*

Detective: I can't --

Defendant: *I'm not trying --*

Detective: I can't tell you whether you should or you shouldn't.

Defendant. *Yeah, I understand.*

Detective: If you want to speak to a lawyer, then I'm done. But then you -- you know, you don't get another chance to talk to me. So I'm out, okay?

[Detective Tobey exited room]

Seven minutes later, when the detective reentered the room, the following exchange occurred:

Defendant: *What's your name again?*

Detective: Detective Tobey.

Defendant: *Tobey?*

Detective: Yes. I want to clarify with you 'cause --

Defendant: *I want to clarify something with you.*

Detective: Okay.

Defendant: *Detective Tobey --*

Detective: Yes?

The defendant started talking about judging people again, and said that he needed to let her know that he is not a criminal and he is not a monster. The detective said she understood:

Detective Tobey: But I just want to know, okay, you said that you -- do you want to continue talking to me or do you want to talk to a lawyer? It's up to you.

Defendant: *I mean, it depends what we're -- what we're talking about.*

Detective: Well, I'm going to talk about why you're in here and what charges. And I'm going to talk about that.

Defendant: *Okay.*

Detective: So do you want to talk to me?

Defendant: *I can -- I can talk to you about it. I mean, like I said, we can talk and, I mean, if I feel like it's something, I'll just say, you know, I don't feel like I should or not.*

Detective: Okay. And you can't --

Defendant: *But we can definitely --*

Detective: You can't walk the line, I don't know if I should. If you don't want to answer something or you don't -- then you tell me, okay.

Defendant: *Okay.*

Detective: But don't -- don't -- don't walk the line. Don't say, oh, well, I'm not sure, I'm not this, I'm not that. Just tell me, okay? So do you want to talk to me?

> Defendant: *Yeah. If it's something I'll just straight up tell you --*
>
> Detective: Okay.
>
> Defendant: *-- like, no, this is not -- I don't want to talk about it, or I'll answer it, just like you said.*

The detective resumed questioning the defendant about what happened in the girlfriend's apartment.

The defendant continued to dodge questions and talked about what happened the day *before* the attack. He eventually admitted that on the day of the attack he and the girlfriend were texting and that she stopped responding when she went to work. He said he was on the highway at that time, heading to the Swap Shop in Broward. This statement was contradicted by law enforcement testimony that the defendant's cell phone was never in Broward on March 7, 2014.

The defendant said when he was driving back from Broward, he "heard they were looking for me." He could not recall if it was dark out and told her that it was "whatever time they came to my house is around the time I was driving back."

He said he headed to Augusta, to the "country." He "googled" the hotel and checked in with someone else's ID. He commiserated some more about wishing people would understand that he wasn't a monster or a criminal. Another detective entered the room and began questioning the defendant about his hand. He confronted him bluntly and at that point, the transcript ends.

Before trial, the defendant moved to suppress the second half of the interrogation. The defendant argued that he unequivocally asserted his right to counsel and that "the detective did not scrupulously honor [his] invocation of his right to counsel."

The judge who presided over the motion to suppress hearing denied the motion, finding that the defendant did not unequivocally invoke his right to an attorney.

We review de novo the trial court's conclusions of law on the motion to suppress. Because the motion was denied based on the trial judge's review of a videotaped interrogation, this court "may review the tape for facts legally sufficient to support the trial court's ruling." *Dooley v. State*, 743 So. 2d 65, 68 (Fla. 4th DCA 1999).

At the outset, we note that the argument the defendant raises on appeal differs somewhat from what he raised below. In the circuit court, he argued that he unequivocally asserted his right to counsel which triggered the officer's obligation to cease questioning. On appeal, he also bases his argument on *Almeida v. State,* 737 So. 2d 520 (Fla. 1999), which holds that when a suspect asks a question concerning his *Miranda* rights, the police must stop interrogation and give a simple and straightforward answer before interrogation may continue.

It is clear that the defendant initially waived his *Miranda* rights. Once he waived those rights, the police were free to interrogate him.

A suspect may invoke a previously-waived right to counsel by clearly requesting counsel. *Davis v. United States,* 512 U.S. 452, 458 (1994). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62. The test of whether a suspect has unequivocally invoked his previously-waived *Miranda* rights is whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459.

The defendant's musings quoted above amounted to thinking out loud about "maybe" retaining an attorney, not an unequivocal request for a lawyer that would have required that interrogation cease. Such aspirational statements are not unequivocal requests for counsel. *Id.* at 462 (the statement, "Maybe I should talk to a lawyer," was not a request for counsel); *Walker v. State,* 957 So. 2d 560, 571 (Fla. 2007) (the suspect's statement, "I think I may need a lawyer," and subsequent question asking detectives whether he needed counsel, were not unequivocal requests for an attorney); *Long v. State,* 517 So. 2d 664, 667 (Fla. 1987) (the statement, "I think I might need an attorney" was equivocal); *State v. Carter,* 172 So. 3d 538, 540 (Fla. 5th DCA 2015) (the statements, "I think I should wait to talk to my public defender," and "I mean I do [want to talk], but I don't think I should" did not constitute unambiguous or unequivocal requests for counsel); *see also Spivey v. State,* 45 So. 3d 51, 54-55 (Fla. 1st DCA 2010) (statement, "I mean if I am being held and I'm being charged with something I need to be on the phone calling my lawyer," was not an unequivocal request for counsel because it "did not clearly indicate that [he] wanted counsel present at that time or that he would not answer any further questions without counsel.").

The defendant here was contemplating his situation. He talked about perhaps not answering certain questions until maybe getting a lawyer. He did not request an attorney. He did not refuse to answer questions without

an attorney. The circuit court did not err in denying the defendant's motion to suppress because the defendant did not unequivocally and unambiguously invoke his right to counsel.

We also discern no violation of *Almeida*. If a suspect does not invoke his right to counsel, but instead, "asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." *Almeida*, 737 So. 2d at 525. "Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights)." *Id.*

"Custodial utterances are extraordinarily rich in diversity and include not only statements affirmatively invoking a suspect's rights but also statements prefatory to the invoking of a right." *Id.* at 523.

> [A] prefatory statement is subject to the following three-step analysis: (1) was the defendant referring to a constitutionally guaranteed right; (2) was the utterance a clear, bona fide question calling for an answer, not a rumination or a rhetorical question; and (3) did the officer make a good-faith effort to give a simple and straightforward answer.

*Daniel v. State*, 238 So. 3d 1283, 1287–88 (Fla. 5th DCA 2018).

On appeal, the defendant argues that his statements during the second half of the interview were involuntary because the detectives failed to give him honest and accurate answers to his bona fide questions about his right to an attorney. The defendant's argument fails for two reasons.

First, the defendant's argument was not made below, so it was not preserved. While the defendant moved to suppress part of his statement, the ground for the motion was different from the ground urged on appeal. "A defendant may not argue in the trial court that a consent was involuntary for certain reasons and then obtain a reversal on appeal on the ground that the consent was involuntary for other reasons." *I.R.C. v. State*, 968 So. 2d 583, 589 (Fla. 2d DCA 2007).

Below, the defendant argued that he unequivocally invoked his right to counsel. The inquiry below, therefore, focused on the objective interpretation of the defendant's words to the police.

On appeal, the defendant's argument is that he asked a question about his right to counsel triggering the detective's duty to cease questioning and

answer the question before continuing the interrogation. This part of the inquiry on appeal focuses on the appropriateness of the detective's response.

Trial counsel for the defendant did not cite *Almeida* and the trial judge did not consider the appropriateness of the detective's answers to the defendant's questions about counsel under *Almeida* and its progeny. The *Almeida* objection was not preserved because the specific legal argument pursued on appeal was not part of the presentation below. *Perez v. State*, 919 So. 2d 347, 359 (Fla. 2005).

The second reason the defendant's argument fails is because his brief fails to pinpoint any "bona fide question" asked by the defendant and any improper response by the detective. At the pages quoted in appellant's brief, the single question the defendant asks the detective is whether she would advise him to get an attorney. She repeatedly states that she cannot give him legal advice, an entirely proper response.

> To require officers to advise and counsel suspects would impinge on the officers' sworn duty to prevent and detect crime and enforce the laws of the state. All that is required of interrogating officers under *Almeida* and *Owen* is that they be honest and fair when addressing a suspect's constitutional rights.

*State v. Glatzmayer*, 789 So. 2d 297, 305 (Fla. 2001). An officer may not evade the suspect's questions, engage in gamesmanship, or steamroll him. *Almeida*, 737 So. 2d at 525 (where the suspect asked "what good is an attorney going to do?" the officer evaded the question by asking whether the suspect wanted to speak with him again).

Here, the detective did not evade the defendant's questions. She answered honestly--that she could not give him advice.

Because the detective responded in an appropriate manner to the defendant's questions about counsel, the detectives could continue the interrogation and there was no error in denying the defendant's motion to suppress.

We have considered the other arguments raised on appeal and find them to be without merit.

WARNER and LEVINE, JJ., concur.

*          *          *

*Not final until disposition of timely filed motion for rehearing.*