752 So.2d 644 (2000)
Kevin BEAN, Appellant,
v.
STATE of Florida, Appellee.
No. 5D99-650.
District Court of Appeal of Florida, Fifth District.
January 7, 2000.
Rehearing Denied March 17, 2000.
James B. Gibson, Public Defender, and Leonard R. Ross, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and David H. Foxman, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, J.
Kevin Bean ["Bean"] appeals the denial of his motion to suppress. Bean was charged by information with the commission of six lewd and lascivious assaults on his five-year old stepdaughter.
On September 15, 1998, Bean filed a motion to suppress a confession he had made to Investigator Mark Moore of the Volusia County Sheriff's Office on June 17, 1998, while he was incarcerated in the Volusia County branch jail on separate charges. The motion alleged:
1. On June 17, 1998, Mr. Bean was incarcerated on two domestic violence charges (98-21034mmaes and 98-21260mmaes).
2. The Public Defender's Officer represented Mr. Bean on both cases.
3. While Mr. Bean was in jail on the domestic violence charges, Inv. Moore *645 conducted a custodial interview. A transcript of that interview is attached.
4. Mr. Bean was not properly advised of his right to remain silent and to counsel because a) Inv. Moore suggested to Mr. Bean that he might not get an attorney for the new charges (page 4, line 10,11) [sic] b) Inv. Moore told Mr. Bean that nothing would be accomplished by him making arrangements to have an attorney present at the interview (page 4, line 13-20).
5. Inv. Moore ignores Mr. Bean's unambiguous request to speak to a lawyer.
6. Mr. Bean did not freely voluntarily and intelligently waive his Miranda rights.
These grounds cause the confession to have been made in violation of the fourth, fifth and fourteenth Amendments to the U.S. Constitution and Article I, Section 9, of the Florida Constitution.
A transcript of the statement made to Investigator Moore was attached to the motion. The transcript reflects that Bean had not yet been charged in the instant case when he made the statement, but was in jail on domestic violence charges. However, his stepdaughter had told investigators that Bean had engaged in improper sexual contact with her. Bean was asked to speak to Investigator Moore on the issue of his stepdaughter. At the outset of the meeting, Bean stated:
I haven't yet been told what I'm gonna get for these charges I'm on. I haven't been able to see an attorney at this point. I'm especially sitting here, waiting for (Inaudible)....
Investigator Moore suggested that "maybe you're more interested in finding out what you're facing, timewise, before you might consider entering a plea. Is that what you're saying?". Bean enigmatically replied, "Basically, no." Investigator Moore then asked Bean about his education. Bean said he had two years of college and admitted he could read pretty well. Bean was advised of his rights, including his right to counsel. Among other things he was told:
Anything you say can be used against you in a Court of Law. You have the right to talk to a lawyer for advice before we ask you any questions, and have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now, without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
Investigator Moore was equivocal, however, concerning whether Bean would be given a second attorney. He stated:
You already have a Court appointed attorney. Conceivably, you would get a second attorney on these new charges. It's conceivable. I'm not sure how that works....
Bean indicated a reluctance to make a statement or to sign a waiver of his rights. He also had questions which he wanted answered before making a statement, such as what he was being charged with. Investigator Moore told Bean he faced a variety of potential charges depending on the facts of the case. He explained the nature of a variety of sexual offenses, including sexual battery, and told Bean the potential penalties. Investigator Moore again made an attempt to explain Bean's rights during the following exchange:
MOORE: First thing, though, I wanna make sure that you do understand your legal rights, that you have the right to remain silent. Anything you say can be used against you in a Court of Law. You have the right to talk to a lawyer for advice before I ask you any questions, and to have him or her present with you during questioning. Now that's not gonna happen today. Okay? If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish. You have an attorney on these other charges, okay. I'm not gonna.... *646 I'll be quite honest with you. I'm not... nothing's gonna be accomplished by me making arrangement to come back her to interview you with your attorney present. Okay?

BEAN: What do you mean, "nothin'"? [sic]

MOORE: There's nothing to be gained. I can talk to your attorney, and say, "Hey, if your client wants to talk, maybe we can set something up," but in all probability, your attorney is probably gonna say, well, no, he doesn't have the (Inaudible) .... to sit down. (Inaudible), in all probability. I wanna make sure you do understand this last statement. You read it. Not the Waiver of Rights statement, but this last sentence here at the top. "If you decide to answer questions now with out [sic] a lawyer being present, you will still have the right to stop answering at any time until you talk to a lawyer. What I'm telling you, if you decide to talk to me right now without your lawyer being here, we'll give it a shot, okay. If, after the interview starts, you decide that you don't wanna say anything, don't wanna answer any more questions, or you don't want to answer a specific question, you just tell me. Okay? And we'll do whatever needs to be done. What I'm telling you is, it's your decision whether or not you want to talk to me about the subject at all, or to any extent, without your lawyer been' present. And I wanna make sure you do understand what you're signing. If you do sign this Waiver of Rights, this Waiver of Rights, the last statement on here saying, "I have read this statement of my Rights, and I understand what my Rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me." Okay?
Bean again asked if "we can still go on without me signing this?" Investigator Moore told him they could "[i]f that's what you want." Bean responded by indicating he wanted to speak to a lawyer, stating:
Well, apparently I'm facing these charges, I feel that I should be able to talk to a lawyer. This is my family here, man. This is my life, my future, you know.
During further conversation, Investigator Moore told Bean that he had talked to Bean's wife and that Bean "in all probability" had no future with this particular family. Investigator Moore went on to say at some length that he was not there to judge Bean, and that there may have been extenuating circumstances which might help explain his actions. They discussed the possible impact of substances abuse and the need for Bean to comply with a domestic violence injunction that had been entered against him. Bean then asked, "How is talking to you today gonna help me in my future?" He also observed that on previous investigations when he had talked to investigators it had come back to haunt him. He said:
Mainly, it's gotten to where most people that's ever said they're gonna try to help me .... it's not just the law or the lawyers .... but most people that's [sic] ever said they're tryin' to help me, end up hangin' me and screwin' me.
In response to Bean's question, what would talking to him do for him, Investigator Moore first said, "I don't know." He later told Bean that it might help to determine the charges to lodge against Bean, to put the offenses in perspective and to prevent the child from testifying in court. Bean then began to talk to Investigator Moore, explaining that he was not "a violent person." After making several statements to Investigator Moore, Moore told Bean that talking to him might help the case progress a little faster. Bean responded that "[a]fter while [sic], it'll kick me in the ass." Investigator Moore then downplayed the effect of a confession, stating, *647 "Well, I wouldn't say that...." Bean then confessed:
BEAN: Let's go with this point.... Yeah, I'm fucked up. I'm not guilty of... I'm not guilty of raping my child. I am guilty of lewd and lascivious acts, as to the point that you put.
Bean denied ever penetrating the child, but admitted that "[t]here were times, yes, that I touched her vagina." He claimed that the child had put his hand on her and he had touched her vagina "three or four times, maybe" while his wife was pregnant, with the baby being born on April 10, 1998. He later amended the number of incidents to six. He said that sometimes the incidents had happened in the morning, after his stepdaughter had crawled in bed with him and his wife. He also admitted that his stepdaughter had touched his penis "a couple of times," also while in bed. "That's, basically, how it started out." However, he later said that the first incident may have happened at night and that "it was just simple curiosity the first time, you know." He also said it happened one time after his wife had the baby, while he and his stepdaughter were in the back trailer. He thought that the last time it had occurred was in April of 1998, which he placed within a month of his arrest.[1] Bean told Investigator Moore that there was a possibility that another man had sexual contact with his stepdaughter. After some further conversation regarding other charges which had been brought against Bean, the interview was terminated.
The court held a hearing on Bean's motion on November 2, 1998. The parties stipulated at the hearing to the accuracy of the transcript attached to Bean's statement. Moore testified that he had "surreptitiously" taped the interview because he wanted a record of the interview and because he was afraid that Bean would be reluctant to be interviewed if he knew he was being taped. He later expanded:
I thought there was a good possibility, based on his criminal past, that it would be easier to get him to talk to me without plopping a tape recorder in front of him.
Moore also admitted that Bean had never signed the Waiver of Rights form, but said that he had nonetheless indicated his intention to waive his rights.
Defense counsel argued at the hearing that Bean's statements should be suppressed because the Miranda warnings he had been given were negated by additional statements made by the investigator, Bean had never waived his Miranda rights, and Bean had made a clear request for an attorney which had been ignored by the investigator.
The court took the motion under advisement. The following day, the court denied the motion, finding:
(1) The State demonstrated by a preponderance of the evidence that the Confession was freely and voluntarily made by the Defendant.
(2) The Defendant's waiver of his constitutional rights to remain silent was knowingly, intelligently and voluntarily made even though he did not sign the Miranda form which he read and which was read to him by Officer Moore.
(3) The statements made by the Defendant concerning a lawyer were at best equivocal and ambiguous. The Defendant could have made a clear request for a Lawyer and stopped talking anytime.
The State contends on appeal that Bean's statement was not a sufficiently "unequivocal" request for counsel so as to invoke his Miranda rights. The requirement that a defendant must make an "unequivocal" request for counsel under Miranda appears to stem from Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), in which the Supreme Court held that if a suspect initially waives his or her rights, the suspect thereafter must thereafter "clearly invoke" *648 his right to counsel during the ensuing interview before questioning must cease. The Florida Supreme Court subsequently adopted the Davis rationale in State v. Owen, 696 So.2d 715 (Fla.), cert. denied, 522 U.S. 1002, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997).
Owen was recently explained and distinguished by the Florida Supreme Court in Almeida v. State, 737 So.2d 520 (Fla.), petition for cert. filed, 68 U.S.L.W. 3368 (U.S.Fla. Nov. 24, 1999) (No. 99-903), which involves statements and questions made "prefatory" to a decision of whether to invoke one rights. In Almeida, the defendant had been picked up by police in connection with a murder and taken to headquarters, where he was read and waived his rights. After the defendant had confessed to the murder, the detective sought to begin a formal recorded interrogation. The detective again read Almeida his rights, and then asked Almeida, "Do you wish to speak to me now without an attorney present?" Almeida replied, "Well, what good is an attorney going to do?" The detective did not respond to the question, and Almeida ultimately confessed to the murder, as well as two others. On appeal, the supreme court found that the question posed by Almeida was a "bona fide question" and not a rhetorical question, and that officers had violated Almeida's rights by ignoring the question. The court distinguished Owen on the basis that there the defendant had attempted to invoke his rights after waiving those rights, while the case before it involved a clear and unambiguous question which sought information regarding Almeida's right to counsel. The court explained:
[The current] scenario is not embraced within our holding in Owen. The type of utterance at issue in Owen was an equivocal statement whichpursuant to Davis required no clarification and could not trump the clear waiver of rights Owen had made earlier. The type of utterance at issue here, on the other hand, was an un equivocal question that was prefatory toand possibly determinative ofthe invoking of a right and which cast doubt on the knowing and intelligent nature of the prior waiver. Detective Mink plainly asked Almeida if he wanted to proceed without a lawyer, and Almeida just as plainly asked the officer what good a lawyer would do. There was nothing equivocal about this exchange and certainly nothing unclear about Almeida's questionit was a simple, direct question, susceptible of but a single interpretation. Almeida very clearly was asking the officer for fundamental information concerning his right to counsel.
Id. at 524. The Almeida court's holding was that:
[I]f, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwisei.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspectis to actively promote the very coercion that Traylor was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State. See Traylor, 596 So.2d at 966.
Id. at 525. Although the Almeida court had distinguished Owen, it found no conflict between Owen and the case before it, explaining that the two decisions worked "hand-in-hand":
Our holding today works hand-in-hand with our decision in Owen in defining a few basic rules governing custodial utterances. We held in Owen that police *649 must honor a clear statement invoking a suspect's rights. See generally Owen, 696 So.2d at 719. We hold today the police similarly must answer a clear question concerning a suspect's rights. These twin rulings establish an unmistakable bright line for law enforcement.
Id. at 525-526.
In this case, even if Bean did not make an unequivocal request for counsel, Investigator Moore failed to properly respond to questions prefatory to making a decision whether to waive his rights. On the authority of Almeida, the statements made after Bean's question concerning his right to a lawyer must be suppressed.
REVERSED.
W. SHARP, and PETERSON, JJ., concur.
NOTES
[1] Actually, the record shows his arrest occurred on June 18, 1998.