923 So.2d 597 (2006)
Chad BARGER, Appellant,
v.
STATE of Florida, Appellee.
No. 5D04-1565.
District Court of Appeal of Florida, Fifth District.
March 24, 2006.
*599 James S. Purdy, Public Defender, and Ailene S. Rogers, Assistant Public Defender, Daytona Beach, for Appellant.
No Appearance for Appellee.
LAWSON, J.
Chad Barger, ("Barger"), appeals the judgments and sentences from two separate cases involving multiple offenses raising two issues on appeal.
The material facts from the most recent case are as follows. In October 2001, Barger attacked a female manager of a Wendy's restaurant as she opened the store for business. He threw her to the floor, punched her until she lost consciousness, and dragged her to his car. He then drove to a secluded location where he raped her and forced her to perform oral sex on him. After the sexual assault, Barger drove the victim back to the restaurant and forced her to turn over money from the business' safe.
As soon as Barger left the restaurant, the victim called "911" and provided a description of Barger and his vehicle. Shortly thereafter, Barger was apprehended with the money stolen from the restaurant and the victim's bloody shirt in his possession. He was identified by the victim as her assailant both at the time of his apprehension, and at trial.
After Barger's arrest, Detective Johnny Lawson and Detective Rory Nelson of the Melbourne Police Department interviewed him. During the interview, the following relevant exchange occurred:
Lawson: You have the right to remain silent. Anything you say can and will be used against you in a court. You have a right to talk with a lawyer for advice before we ask you any questions, and to have him present during the questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer the questions now without a lawyer being present, you still have a right to stop answering at any time. You also have a right to stop answering at any time until you talk to a lawyer. Do you understand these rights?
Defendant: Yes.
Lawson: Do you wish to speak with us without a lawyer being present?
Defendant: I want to know what I'm being charged with.
Lawson: Sure, let me tell you about that, but are you willing to talk with us now without a lawyer being present?
Defendant: (Inaudible).
Lawson: Is that a no or a yes?
Defendant: Yeah, Yeah.
Lawson: You will talk now?
Defendant: Indicates.
Lawson: Right now what we are doing is we are investigating a  (inaudible) he's your probation officer.
Defendant: (Inaudible) He has nothing to do with Probation or Parole.
Lawson: Well, he's here to represent Probation and Parole. He's not ... (inaudible).
We are investigating some things that occurred earlier this morning with a car. From what I understand is police officers, I guess, gave chase to that car, observed you bail out of it, run through some woods, and we all got involved with that (inaudible) car stolen. You know that?

*600 Defendant: (Indicates).
Lawson: A sack of money laying on the ground that you dropped when you got out of the car (inaudible). There is also some problems that occurred at a restaurant this morning (inaudible) know why you are here? ... followed her when she opened the door and smacked her a couple of times, took her and put her in the car, sexually assaulted her, brought her back in.
Defendant: I never took no girl.
Lawson: Well, this is what I'm saying. These are the allegations.
As the interview continued, Barger made incriminating statements linking him to the crimes.
In November 2001, the State filed a five-count information, charging Barger with burglary of a structure with an assault or battery (count I), kidnapping (count II), two counts of sexual battery by threats of serious personal injury (counts III and IV), and robbery (count V).
Barger moved to suppress the statements he made during the custodial interview with Detectives Lawson and Nelson, arguing that his statements were involuntary and taken in violation of his federal and Florida constitutional rights. The court held a hearing on the motion, during which the court watched a video-taped recording of the interview. During the hearing, Barger limited his motion to two arguments. First, he argued that when asked if he wanted to talk with the detectives without a lawyer present, he made both verbal and non-verbal negative responses. Specifically, he claimed that when Lawson asked him if he was willing to talk without his lawyer being present, he actually "nodded his head negatively from side to side" and said "Nah." Second, he argued that he asked a prefatory question that the detectives failed to answer before continuing with the interview. Specifically, he asserted that under Almeida v. State, 737 So.2d 520 (Fla.1999), the detectives' failure to immediately answer his question regarding the charges against him rendered his testimony involuntary and therefore subject to suppression.
Detective Lawson testified at the suppression hearing that at the time of the interview he did not know what specific charges would be filed against Barger. He also testified that he interpreted Barger's head shaking as an affirmation of his desire to speak without his lawyer present, and noted that he clarified his question by asking Barger if the gesture was intended to be a yes or a no. He stated that Barger responded to the clarifying question by stating "Yeah, Yeah."
The trial court reviewed the video tape "numerous times" and concluded that when Barger was asked whether he wished to speak without his lawyer present, he said "Yeah" not "Nah." The court also found that Barger's head gestures "were a continuation of his prior head bobbing, and were not intended by him to be a nonverbal no." The court denied Barger's motion to suppress and the case proceeded to trial. He was found guilty of all five charges.
At the time Barger committed the crimes charged in the 2001 case, he was on probation for a 1995 conviction, where the underlying charges included armed burglary of a conveyance with assault or battery (count 1), armed kidnapping (count II), and attempted sexual battery by use of threat of a deadly weapon (count III). In 1995, the court withheld adjudication on counts I and II, but adjudicated Barger guilty on count III. He was initially sentenced to six years probation, with the first served under community control. In 1997, Barger was found guilty of violating his probation, and his probation was revoked. *601 He was sentenced to 40 months prison for counts I and II, followed by probation until September 5, 2002 for count I, and sentenced to 3 years prison for count III. An affidavit of violation of probation was filed alleging that Barger had violated his probation with the 2001 charges, an unrelated indecent exposure charge, and other technical violations.
During Barger's trial on the 2001 charges, the presiding judge also sat as the finder of fact for Barger's violation of probation case. Following the trial, the court found that Barger had violated condition five of his probation by pleading guilty to exposure of sexual organs, and by committing the offenses alleged in the 2001 case. The score sheet for the violation of probation case indicated that the maximum penalty that the court could impose based on the violation was 141.75 months incarceration. The court, however, ordered an upward departure sentence of life imprisonment finding that the crimes with which Barger violated his probation represented an "escalating pattern of criminal conduct."
The jury subsequently returned guilty verdicts on all five counts in the 2001 case. As to those charges, the court sentenced Barger as a prison releasee reoffender to life imprisonment for counts I and II, thirty years imprisonment for counts III and IV, and fifteen years imprisonment for count V. All sentences were ordered to run concurrently.
Barger timely appealed, challenging: (1) the denial of his motion to suppress; and (2) his upward departure sentences in the 1995 case.
With respect to the suppression issue, both the Fifth Amendment to the United States Constitution and Article 1, Section 9 of the Florida Constitution provide that no person "shall be compelled in any criminal case to be a witness against himself." This privilege against self-incrimination is applicable during a custodial interrogation. E.g., Miranda v. Arizona, 384 U.S. 436, 460-461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Caso v. State, 524 So.2d 422, 423 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). A statement is not "compelled" within the meaning of state or federal law if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. Miranda, 384 U.S. at 444, 86 S.Ct. 1602. The state must prove by a preponderance of the evidence that a defendant's Miranda rights were waived. E.g., Balthazar v. State, 549 So.2d 661, 662 (Fla.1989). To constitute a voluntary waiver, the state must show: 1) that the waiver was the result of a free choice on the part of the defendant and not the product of intimidation, coercion, or deception; and 2) the waiver was made with a full awareness of the nature of the right being abandoned and the consequences of the abandonment. See Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived. E.g., Globe v. State, 877 So.2d 663 (Fla.2004).
Here, Barger asserts that he did not waive his Miranda rights because he made verbal and nonverbal negative responses regarding his desire to proceed without counsel. With respect to this issue, it is clear that the trial court took great care in reviewing the evidence. The court's conclusion that Barger waived his Miranda rights is clearly supported by competent and substantial evidence, and must be affirmed.
*602 Barger next asserts that his statement to police cannot be used because the detectives failed to timely answer his "prefatory" question regarding the charges that were pending against him. He asserts that he needed to know what crimes he was being charged with before he could make a voluntary, knowing and intelligent waiver of his right to counsel. In support of his argument, Barger cites Almeida and Bean v. State, 752 So.2d 644 (Fla. 5th DCA 2000). Neither case directly supports his position.
In Almeida, the following exchange occurred after the defendant was read his Miranda rights:
Q. Do you wish to speak to me now without an attorney present?
A. Well, what good is an attorney going to do?
Q. Okay, well you already spoke to me and you want to speak to me again on tape?
Q. (By Detective Allard) We are, we are just going to talk to you as we talked to you before, that is all.
A. Oh, sure.
The defendant was convicted of first-degree murder and was sentenced to death. The Florida Supreme Court reversed the conviction and vacated the sentence, holding that "if at any point during custodial interrogation a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." Almeida, 737 So.2d at 525. The Court held that the police detective had to answer defendant's question ("Well, what good is an attorney going to do?") before continuing interrogation because it was indisputable that the defendant was referring to his right to counsel. Id. at 524. The Court noted that a confession should not be suppressed based on a trivial or insubstantial violation of this rule, and that once an officer properly answers the question, he or she may then resume the interview unless the defendant has invoked his or her right not to continue. Id.
In Bean, the defendant also asked about the benefit of having an attorney present, as well as what charges he was facing, before making any statement or signing a waiver of his rights. 752 So.2d at 644. The officer told the defendant that nothing would be gained, provided a general overview of the charges pending against him, and continued the interview. We held that even though Bean did not make an unequivocal request for counsel, when a "suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." Id. at 649 (emphasis added). In Bean, we found that the officer had glossed over the defendant's question about his right to counsel and engaged in the kind of "steam-rolling" condemned in Almeida. Id.
By contrast, in the instant case we find the trial court correctly held that the statement "I want to know what I am being charged with" was not a prefatory question concerning Barger's constitutional rights. Therefore, the officers were not required to answer the question before continuing the interview. See, e.g., State v. Jones, 763 So.2d 1180 (Fla. 4th DCA 2000) (holding failure of law enforcement officials to inform a suspect in custody what offenses he or she would be questioned about did not affect the suspect's decision to waive the Fifth Amendment privilege in any constitutionally significant manner citing Colorado v. Spring, 479 U.S. 564, 576, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)).
Further, Barger's argument that his question regarding the pending charges was "ignored" is not supported by *603 the record. The transcript clearly shows that immediately after Barger asked his question, the detective confirmed that Barger wanted to continue the interview without his attorney, and then began to answer Barger's question by explaining the allegations to the best of his knowledge. After learning the factual basis for the custodial interview, Barger elected to continue speaking with the detectives. Based on these facts, it is clear that Barger knowingly, voluntarily, and intelligently waived his privilege against self-incrimination. Therefore, the motion to suppress was properly denied.
As previously noted, Barger's second issue on appeal involves the upward departure sentence Barger received in the 1995 case. On October 8, 2004, while this appeal was pending, Barger filed a rule 3.800(b)(2) motion in the trial court to correct his sentences in the 1995 case. At a hearing on November 5, 2004, the State conceded error. See Rodriguez v. State, 645 So.2d 98 (Fla. 3d DCA 1994) (recognizing trial court may not impose sentence exceeding one cell upward departure upon revocation of probation unless excess departure is based on valid reasons which existed at the time defendant was placed on probation). The trial court granted the motion and set re-sentencing for January 4, 2005. Recognizing that it would lose jurisdiction if it did not enter an order before December 9, 2004, the trial court granted an extension of sixty days and set the rehearing for January 4, 2005. As of March 9, 2005, the re-sentencing hearing still had not occurred, prompting this court to issue an order to show cause why the appeal should not be dismissed for failure to file an initial brief. On March 17, 2005, Barger responded by requesting this court to relinquish jurisdiction in order for him to be re-sentenced by the trial court on the earlier case. On May 12, 2005, the trial court held a hearing, and re-sentenced Barger to 141 months prison with credit for time served for the 1995 case. On May 20, 2005 this court entered an order denying Barger's request to relinquish jurisdiction, stating that the trial court failed to enter a written order on Barger's motion within the sixty-day time period allowed under rule 3.800(b)(2).
Barger correctly argues that because the corrected sentences were entered after the trial court's jurisdiction expired, they are void. See Campbell v. State, 789 So.2d 1213 (Fla. 1st DCA 2001). Therefore, with respect to the second issue, we find that the sentences originally imposed upon Barger's violation of probation in the 1995 should be reversed, with the case remanded to the trial court for re-sentencing (on the 1995 charges only) consistent with the trial court's May 12, 2005 order. Barger need not be present for the re-sentencing. E.g., Brazley v. State, 871 So.2d 986 (Fla. 3d DCA 2004).
In summary, we affirm the judgments and sentences entered in the 2001 case. With respect to the 1995 case, the sentences originally imposed on April 5, 2004 are reversed, and the re-sentencing orders entered on May 12, 2005, are quashed. The case is remanded to the trial court for re-sentencing consistent with the May 12, 2005 orders.
AFFIRMED IN PART; REVERSED IN PART: 1995 SENTENCES REVERSED, MAY 12, 2005 RE-SENTENCING ORDERS QUASHED, and REMANDED.
PLEUS, C.J., and SHARP, W., J., concur.