IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

JAHMAHREE DANIEL,

      Appellant,

 v.                                      Case No.  5D16-3340

STATE OF FLORIDA,

      Appellee.

_____/

Opinion filed March 29, 2018

Appeal from the Circuit Court
for Orange County,
Renee A. Roche, Judge.

James S. Purdy, Public Defender, and
Robert Jackson Pearce III, Assistant Public
Defender, Daytona Beach, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Andrea K. Totten,
Assistant Attorney General, Daytona Beach,
for Appellee.

ORFINGER, J.

      Jahmahree Daniel appeals his convictions and sentences, arguing that the trial court erred by denying his motion to suppress his post-arrest statement to law enforcement.[1]  We agree and reverse.

_____

      [1] We affirm as to Daniel's other issue without discussion.

The charges against Daniel stemmed from a bank robbery. Just after Brinks had completed its cash delivery, three men wearing bandanas, gloves, hooded sweatshirts, and wielding what appeared to be handguns stormed a SunTrust Bank, yelling "Put your hands up!" The robbers zip tied the bank employees and customers before making off with $140,000 from the vault. Within an hour, the GPS trackers mixed in with the stolen money were found discarded by a lake, directly behind the apartment that Daniel shared with his girlfriend and children.

Several days later, Daniel was taken into custody on unrelated charges, although investigators already suspected that he was involved in the robbery. While Daniel was at the police station, his mother gave the police a key to a storage locker. The police searched the storage locker, discovering multiple items linked to the robbery, including: articles of clothing similar to those described by the victims, zip ties, approximately $67,000 in cash wrapped in SunTrust wrappers, an unloaded pellet gun, and a box of 20-gauge shotgun shells. Daniel's fingerprints were found on the box of shotgun shells and some of the money wrappers.

After being read the Miranda[2] warnings and agreeing to be interviewed, law enforcement personnel began interrogating Daniel. During the first of two recorded interviews, the following exchange occurred between Daniel and one of the interrogating officers:

Q    So you would tell us the truth if you did it, right? And you'd tell
     us 'cause of your kids?

A    And I wanna. . .

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Q    So. . .

A     . . . be there for my kids, yeah.

Q     . . . you wanna be there for your kids. Well, here's your opportunity because the more lies we get. . .

A    (Sigh.)

Q     . . . and it doesn't, it's not helping you.

A     Look, can I have a lawyer, man, 'cause y'all is tryin' to confuse me and I know what I think and I know what I see and. . .

Q    That's what you want?

A    What else? I ain't did nothin' wrong!

Q    You don't wanna talk anymore?

A    I ain't did nothin' wrong! I'm talkin' and talkin'.

Q    I believe I asked you a couple questions.

A    Yeah.

Q    It's up to you, do you wanna continue this interview?

A    It's not gettin' nowhere. Y'all keep still sayin' I did somethin' I didn't do.

Q    You didn't answer my question directly - do you wanna continue this interview? That is yes or no.

A     (Sigh.) Can I go home?

Q    Do you wanna continue this interview, yes or no?

A    Well, it's not goin' nowhere.

Q     Okay.

A    Y'all just tellin' me I did somethin' and I'm sayin' I didn't do nothin'.

3

The officers continued the interrogation—never returning to the issue of Daniel's request for counsel. After the first interview ended, law enforcement officers again interrogated Daniel, informing him that in the intervening two hours, the police had searched the storage locker and found evidence of the robbery. Daniel then admitted that he participated in the bank robbery. In his written statement, Daniel said that he was one of the three men who walked into the bank and demanded money, the employees gave it to them, they left, and when they found the trackers in the money, they threw them out near a lake.

Daniel was arrested and subsequently filed a pre-trial motion to suppress the incriminating statements, which was denied after a hearing. Following a trial, the jury found Daniel guilty of one count of robbery with a deadly weapon, one count of aggravated assault with a deadly weapon, and three counts of false imprisonment with a weapon. He challenges the trial court's denial of his motion to suppress in this appeal.

Daniel contends that the trial court erred in denying his motion to suppress his post-arrest statement because his statement "Can I have a lawyer" was an unequivocal and unconditional request for counsel. He asserts the police should have honored his request and ceased their questioning until counsel was available to him. Daniel further argues that even if his statement did not invoke the right, it was at least prefatory to that invocation, and required a simple, straightforward answer.

A trial court's ruling on a motion to suppress is presumptively correct and will be upheld if supported by the record. E.g., Cuervo v. State, 967 So. 2d 155, 160 (Fla. 2007); San Martin v. State, 717 So. 2d 462, 469 (Fla. 1998). We defer to the trial court findings of fact, provided they are supported by competent, substantial evidence, but review its

4

application of law de novo. Delhall v. State, 95 So. 3d 134, 150 (Fla. 2012); Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002).

A suspect has the right to consult with an attorney and to have an attorney present during custodial questioning. Spivey v. State, 45 So. 3d 51, 54 (Fla. 1st DCA 2010) (citing Miranda v. Arizona, 384 U.S. 436, 469-73 (1966)). "If a suspect clearly and unequivocally requests counsel at any time during a custodial interview, the interrogation must immediately stop until a lawyer is present or the suspect reinitiates conversation." Id. On the other hand, if a suspect makes an equivocal or ambiguous request for counsel, police officers are not required to stop the interrogation or ask clarifying questions. Id. at 53, 54-55 (holding that appellant's statement, "I mean if I am being held and I'm being charged with something I need to be on the phone calling my lawyer," was not unequivocal request for counsel because it "did not clearly indicate that [he] wanted counsel present at that time or that he would not answer any further questions without counsel"); see also Walker v. State, 957 So. 2d 560, 571, 574 (Fla. 2007) (finding that appellant did not make unequivocal request for counsel where he said, "I think I might want to talk to an attorney" and later asked agent if he needed attorney); Jones v. State, 748 So. 2d 1012, 1020 (Fla. 1999) (finding that appellant's statement that he wanted to speak "to his mother, his attorney, and Detective Parker" was not unequivocal request for counsel).

Whether a suspect has invoked the right to counsel is an "objective inquiry" that requires "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 459 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). "A statement either is such an assertion [of the right to counsel] or it is not." Smith v. Illinois, 469 U.S.

91, 97-98 (1984). This is an objective determination that will look to the understanding of a reasonable officer in light of the circumstances. Davis, 512 U.S. at 458-59. In this inquiry, the court does not consider the totality of the circumstances of the interrogation. Smith, 469 U.S. at 97-98. Indeed, it is error to consider any statements subsequent to the request, which are only relevant to the question of waiver. Id. at 98-100 (holding that accused's post-request responses to further interrogation may not be used to cast retrospective doubt on clarity of initial request itself).

Applying these standards, we conclude that Daniel's request for a lawyer was an unequivocal request for counsel. See Laurito v State, 120 So. 3d 203, 204 (Fla. 5th DCA 2013) (holding statement "Can I make a phone call so I can get a lawyer?" to be unequivocal request for counsel); State v. Soto, 954 So. 2d 686, 688 (Fla. 4th DCA 2007) (holding that defendant's statement to police officer during custodial interrogation, "I can't make a phone call or nothing, no?" was clear and unambiguous request for lawyer in context); Bean v. State, 752 So. 2d 644, 646 (Fla. 5th DCA 2000) (viewing statement "I should be able to talk to a lawyer" as unequivocal request for counsel); see United States v. Lee, 413 F.3d 622, 624 (7th Cir. 2005) (determining clear assertion of right to counsel where defendant asked "Can I have a lawyer?"); People v. Howerton, 782 N.E.2d 942, 945 (Ill. App. Ct. 2003) (holding "Well, can I have a lawyer then?" was valid request invoking defendant's right to counsel); State v. Dumas, 750 A.2d 420, 424 (R.I. 2000) (explaining "Can I get a lawyer?" may be unequivocal request for counsel unlike "Do I need a lawyer?," which is request for advice).

However, even if Daniel's inquiry is viewed as an equivocal question about whether he could have a lawyer, the interrogating officer was required to cease his questioning

6

and give a "simple and straightforward" answer to the question. See Almeida v. State, 737 So. 2d 520, 525 (Fla. 1999). In Almeida, the Florida Supreme Court distinguished an equivocal statement that requires no clarification from a question that is "prefatory to—and possibly determinative of—the invoking of a right." 737 So. 2d at 523. The court held that

> if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwise—i.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspect—is to actively promote the very coercion that Traylor [v. State, 596 So. 2d 957 (Fla. 1992)] was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State.

Id. at 525. Thus, a prefatory statement is subject to the following three-step analysis: (1) was the defendant referring to a constitutionally guaranteed right; (2) was the utterance a clear, bona fide question calling for an answer, not a rumination or a rhetorical question; and (3) did the officer make a good-faith effort to give a simple and straightforward answer. Id. at 523–25.

Here, as in Almeida, Daniel was clearly referring to his right to counsel. While Daniel's statement was made well into the police interview and not in response to the reading of his rights, Daniel clearly indicated a desire to speak with a lawyer. Daniel's statement is a much more direct reference to the right to counsel than the statement in Laurito—"Can I make a phone call so that I can get a lawyer"—which this Court found

7

constituted an unequivocal request for counsel as well as was sufficient to trigger the officer's duty under Almeida to provide a simple straightforward answer before continuing the interview. Turning to the next step in the Almeida analysis, the statement at issue was a bona fide question calling for an answer. From the record of the suppression hearing, it is clear that the officers interpreted Daniel's statement as if it was a bona fide question calling for an answer, which was never given (the final step of the analysis).

The State argues that the error, if any, was harmless. We disagree. "The erroneous admission of statements obtained in violation of Miranda rights is subject to harmless error analysis." Mansfield v. State, 758 So. 2d 636, 644 (Fla. 2000) (quoting Caso v. State, 524 So. 2d 422, 425 (Fla. 1988)). In State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986), the Florida Supreme Court explained:

> The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.

(Citation omitted). Importantly,

> the applicable test "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test." DiGuilio, 491 So. 2d at 1139. Likewise, it is not a strong evidence test. Rather, the test is "whether there is a reasonable possibility that the error affected the verdict." Id.; see also Ventura v. State, 29 So. 3d 1086, 1091 (Fla. 2010) (quashing and remanding a district court's decision when the harmless error analysis focused on overwhelming evidence of guilt because it "does not address a proper [DiGuilio] analysis and does not discuss whether there is a reasonable possibility that the . . . error affected the verdict").

Cooper v. State, 43 So. 3d 42, 43 (Fla. 2010); see Jackson v. State, 107 So. 3d 328, 342 (Fla. 2012) (reiterating that court "has many times emphasized that the harmless error test is not a 'sufficiency of the evidence' test or an 'overwhelming evidence' test because the relative strength of the permissible evidence does not negate the fact that the impermissible evidence may have played a substantial part in the jury's deliberation"); State v. Lee, 531 So. 2d 133, 136 (Fla. 1988) (recognizing focus of harmless error analysis must be effect of error on trier of fact). Applying this test, we conclude the error was not harmless beyond a reasonable doubt.

Here, compelling evidence of Daniel's guilt was presented to the jury through his confession, in which he admitted that he took part in the bank robbery where he held up the bank's employees and guests, zip tied them, took money from the bank vault, and dumped the trackers behind his apartment building. It is simply impossible to conclude that the erroneous admission of this highly detailed confession did not contribute to the convictions in this matter. DiGuilio, 491 So. 2d at 1135.

We reverse Daniel's convictions and sentences and remand for a new trial.

AFFIRMED in part; REVERSED in part; and REMANDED.


TORPY, J., concurs.
COHEN, C.J., dissenting, with opinion.

9

COHEN, C.J., dissenting, with opinion.

I agree with the majority that the trial court erred in denying Daniel's motion to suppress the confession. The statement, "Look, can I have a lawyer, man," is a clear assertion of the constitutional right to counsel, warranting suppression when that request was not honored. In my view, however, the error in admitting Daniel's confession was harmless.

Other than a video recording of the commission of a crime, the admission of a confession is often the most compelling and damaging evidence that can be presented at trial. Nonetheless, the erroneous admission of a confession is not per se reversible error; instead, a harmless error analysis applies. Mansfield v. State, 758 So. 2d 636, 644 (Fla. 2000). To establish that an error was harmless, the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986).

In determining whether an error was harmless, appellate courts must examine the entire record, view the admissible evidence presented to the jury, and consider how the jury might have been influenced by the improperly admitted evidence. See id. Although the analysis "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test," see id. at 1139, in order to employ the analysis, we are compelled to examine the evidence admitted, without objection, of Daniel's guilt.

10

Within hours of the bank robbery, tracking devices from the money stolen from the bank were found behind the apartment building where Daniel resided. Three days after the robbery, Daniel's brother, Jashua, along with another man, were arrested in a rental car following a traffic stop. Police found roughly $4,200 in the center console of the vehicle. Both men denied knowing that the money was in the car. It became clear from Jashua's phone call to his mother from jail that both he and Daniel had participated in the robbery. Jashua instructed his mother to clean out the house and backyard, to put everything back in storage, and not to wait for Daniel to help. Jashua also instructed her to keep no more than 200 or 300, obviously referring to money.

Based on that phone call, police served warrants on both Daniel's and the mother's residences. The mother thereafter provided police the location of and a key to a storage unit. In that unit, police discovered $67,000 in cash secured in SunTrust bands on which the fingerprints of Jashua, Daniel, and their mother were located. Police also found clothing precisely matching the description of those worn by the bank robbers, zip ties consistent with those used in the robbery, an unloaded airsoft pellet gun, and a box of 20-gauge shotgun shells. Daniel's fingerprints were located on the box of shotgun shells.

While the State noted that Daniel confessed to participating in the robbery, his confession was not the focus of the State's closing argument. In my view, the introduction of the confession did not affect the verdict in this case, and the erroneous admission of the confession was harmless.[3] I would affirm.

---

[3] This harmless error analysis contemplates that absent the introduction of the confession, Daniel could attempt to argue identity as a defense to the charges.