FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D17-2793
_____

JOSHUA BRANDYN GASKEY,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Holmes County.
Christopher N. Patterson, Judge.

May 21, 2019

WINOKUR, J.

Following a jury trial, Joshua Brandyn Gaskey was convicted of two counts of first-degree murder, one count of armed robbery, and one count of armed burglary. Gaskey shot and killed Sheley and Jacquelyn Brooks in their home while stealing their prescription medication to satisfy a drug debt. We affirm Gaskey's judgment and sentence.

I.

The day after the murders, Gaskey and his girlfriend, Sarah Carroll, were arrested. Carroll was placed in an interview room and was questioned by Holmes County Sheriff's Office Investigator Michael Raley and Lieutenant Tyler Harrison.

Carroll waived her *Miranda* rights and stated that she had driven to the Brookses' residence on the day of the incident with Gaskey and a man known to her as "Pooh." Gaskey entered the home while Carroll and Pooh stayed in the car. According to Carroll, Gaskey had been in the home for approximately fifteen to twenty minutes when she heard three loud bangs. Gaskey then left the home and got back in the car with two bottles of prescription pills. Gaskey, Carroll, and Pooh then drove to a motel where Pooh divided up the pills to settle Gaskey's drug debt. Carroll stated that she asked Gaskey about the bangs she heard in the residence and Gaskey responded that he didn't know what she was talking about.

Prior to the start of his interview, Gaskey asked an officer why he was hearing Carroll cry. The officer repeatedly told Gaskey to stay seated and that he did not know why or if Carroll was crying. Gaskey then became belligerent and went on an expletive-laced tirade against the officer and police in general.

After entering Gaskey's interview room, Raley and Harrison informed Gaskey of his *Miranda* rights. Gaskey told Raley he understood his rights, and read and initialed a *Miranda* rights form indicating that he understood his rights. As to the question whether he had "previously asked any law enforcement officer to speak to an attorney," Gaskey wrote "Not Yet!" Regarding the question "[w]ith these rights in mind do you wish to speak with me?" Gaskey wrote "Yes!"

From the outset of his interview, Gaskey asked Raley and Harrison if Carroll was the person he heard crying in the other room. Raley confirmed that Carroll was in the other room crying. As the interview progressed, Gaskey became confrontational and told the officers that he did not care about the Brookses and that all he was concerned about was Carroll's well-being:

> I, I care about [Hardin, the son of the Brookses], and I care about [Carroll], but I really don't care about that s**t, I just want to know what's going on with [Carroll]. After that, I just want to go to a cell and lay down for a while. I'm probably going to sit here and dope sick off my ass right now, I just want to know what's wrong with

[Carroll], that's all I care about, everything, I don't care about any of this.

The officers told Gaskey that his cell phone and video surveillance placed him in the vicinity of the crime scene, Gaskey informed Raley and Harrison that he would tell them the truth if he saw Carroll. Gaskey then proceeded to state that he owed Pooh a drug debt and that Pooh threatened Carroll's life over it. As a result, they went to the Brookses' home to get their prescription pills. Gaskey planned to just ask the Brookses for the pills or to take them by force if they did not agree since they were elderly. Gaskey admitted that he went inside the residence with a gun intending to scare them into giving him the pills, but the gun had a "hair trigger" and went off. Gaskey also confirmed that he shot Sheley Brooks first and that he threw the gun into the ocean off the Three Mile Bridge.

Before trial, Gaskey filed a Motion to Suppress Evidence regarding his post-arrest interrogation alleging that he had invoked his right to silence and counsel. The trial court held a hearing and issued an order denying the motion, concluding that Gaskey did not make an unequivocal statement indicating that he wanted to cease questioning. Gaskey then filed a second suppression motion, arguing that law enforcement misstated the law during the interrogation. The trial court held another evidentiary hearing and denied this second motion, concluding that law enforcement did not make any misrepresentations of fact or law.

II.

A trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001). The trial court's factual findings will be upheld if there is competent, substantial evidence to support them. *State v. Young*, 974 So. 2d 601, 608 (Fla. 1st DCA 2008). However, the trial court's application of the law to those facts is reviewed de novo. *Id.*

Both the United States Constitution and the Florida Constitution provide protections against self-incrimination.

3

Amend. V, U.S. Const.; art. I, § 9, Fla. Const. Any statements obtained by police in violation of these constitutional provisions are to be suppressed pursuant to the exclusionary rule. *Cuervo v. State*, 967 So. 2d 155, 160 (Fla. 2007). In *Miranda v. Arizona*, the United States Supreme Court created a prophylactic rule whereby police are required to inform defendants of their right to remain silent, as well as their right to counsel prior to any custodial interrogation. 384 U.S. 436 (1966).

Once a suspect has waived *Miranda* rights, police are not required to end an interrogation if the defendant makes an equivocal or ambiguous request for counsel. *State v. Owen*, 696 So. 2d 715, 717 (Fla. 1997) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). Only an unambiguous and unequivocal request for counsel requires that police terminate an interrogation. *Owen*, 696 So. 2d at 719. Similarly, a defendant's invocation of the right to silence must also be unequivocal and unambiguous. *Kalisz v. State*, 124 So. 3d 185, 202 (Fla. 2013) (citing *Berghuis v. Thompkins,* 560 U.S. 370, 381-82 (2010)).

### III.

Gaskey argues that while he initially waived his *Miranda* rights, he subsequently invoked his right to counsel during the interrogation. As a result, Investigator Raley should have ceased questioning. Because we see neither an unequivocal nor an unambiguous assertion of his right to counsel, we disagree.

Gaskey read and signed a form informing him of his *Miranda* rights and stated that he wanted to speak with Raley and Harrison. Almost immediately after the interrogation began, Gaskey began to pepper Raley with questions about Carroll. As the interrogation continued, Gaskey became more frustrated about why Carroll was crying. Raley told Gaskey that Carroll was crying because she had "figured out what happened today." Gaskey replied that he did not really care what happened to the Brookses and that all he cared about was finding out what was happening to Carroll. Exasperated, Gaskey stated as follows:

> Go ahead and, go ahead and tell me your conclusions, I don't care, or what [Carroll's] conclusions are, I don't

care, like I said, I just want to know what's wrong with [Carroll]. So, tell me what she's figured out, and after that, go ahead and f*****g sign off that I need a lawyer or whatever if I'm being arrested. If I'm not being arrested, then take me to a cell for my other warrants, so I can go ahead and get this s**t over with. But other than that, like I said, I want to know what's wrong with her, so whatever she's figured out, tell me what she's figured out so I can go ahead and go to a cell now because other than that, I'm done.

Gaskey points to this exchange as an unequivocal and unambiguous invocation of his right to counsel. We disagree. It appears that Gaskey's primary motivation was to get information about Carroll. Indeed, Gaskey's entire conversation with Raley centered on Gaskey's repeated requests to find out why Carroll was crying and later what she "figured out."

More importantly, Gaskey's statement was entirely conditional. To the extent Gaskey was asserting his rights to counsel or to end questioning, it was dependent on receiving information about Carroll. In fact, he ended his statement by saying "tell me what she's figured out so I can go ahead and go to a cell now because other than that, I'm done." Thus, it is reasonable to assume that Gaskey had no intention of ending the interrogation in order to confer with counsel. Instead, Gaskey simply wanted more information about Carroll. This is bolstered by the fact that Gaskey kept talking with Raley and answering his questions. It appeared that Gaskey was only vaguely referencing his right to counsel as a way to extract information about Carroll from police. Such a statement is not an unambiguous and unequivocal assertion of ones *Miranda* rights.[1]

_____

[1] Florida courts have ruled that statements that appear to be more explicit requests for counsel than Gaskey's are equivocal. *See Jones v. State*, 748 So. 2d 1012, 1020 (Fla. 1999) (finding the defendant's request "to talk to his mother [and] his attorney" insufficient to invoke his right to counsel); *Long v. State*, 517 So. 2d 664, 667 (Fla. 1987) (concluding that the statement "I think I might need an attorney" was equivocal); *Waterhouse v. State*, 429 So. 2d 301, 305 (Fla. 1983) (holding that the statements "I think I

Accordingly, Raley was under no obligation to stop the interrogation based on these statements.

IV.

Gaskey also argues that his incriminating statements during the interview were involuntary because Lieutenant Harrison misstated the law. Since his confession came after the alleged misstatement of law, Gaskey asserts that the trial court erred in denying his motion to suppress.

An involuntary confession is inadmissible. *Martin v. State*, 107 So. 3d 281, 298 (Fla. 2012). A confession is voluntary if it is "the product of free will and rational choice," which is determined by the totality of the circumstances surrounding the confession. *Id.* Direct or implied promises render a confession inadmissible *only* if the promise made the confession involuntary in the totality of the circumstances. *Id.* at 313-14. A causal connection, however, must be found between the improper promise or coercive conduct and the defendant's subsequent confession. *Ramirez v. State*, 15 So. 3d 852, 855-56 (Fla. 1st DCA 2009).

After a long exchange with Investigator Raley and Lieutenant Harrison regarding what he did the day of the murders, Gaskey reiterated his near-constant request to know why Carroll was crying. Gaskey then immediately proceeded to state that whatever he knew was irrelevant based on the allegations Raley and Harrison were making about Gaskey's involvement in the crime. At that point Harrison explained the difference between first-degree murder, second-degree murder, and manslaughter using hypothetical scenarios to illustrate the difference between them:

[HARRISON]: Well, yeah, there is, see, there's different levels of murder, there's premeditated, that's where you

want to talk to an attorney before I say anything else" and "I think I'd like to talk to my attorney" were both equivocal).

6

said I'm going to drive over there and I'm going to kill them for the pills, that's premeditated, I don't want to believe that, okay. Then there's second degree, that's where you go over there, in the heat of the moment, something happens, somebody dies. Then there's manslaughter, that's where he got over there and something accidentally, it was fight over the gun and something like that happened, that's the lowest level, okay. So, you're talking about everything from life in prison all the way down to a few years in prison, so that's where I need to know that why and where, okay, that why, because without that why, all I can do is go back and say, he's saying he ain't left Pensacola, we can put him here, we can show it, I got witnesses, I got everything else, but he wants to say that, okay, but that is why I need to know that why. That's where that why comes in very important, so I need to know why that happened. What was your train of thought? What were you thinking? I mean, I know you saw (sic) you've been doping all day.

Afterwards, Gaskey responded, "[i]f you want to hear my answer, I want to tell it to [Carroll], I want her to hear it from me, I'll tell you whatever you want to know." Gaskey also promised to tell "the truth." Gaskey then proceeded to confess to entering the Brookses' residence with the intention of stealing their prescription pain medication and accidentally shooting both of them multiple times.

Gaskey relies on *Baptiste v. State*, 179 So. 3d 502 (Fla. 1st DCA 2015), for his assertion that Harrison misstated the law as it related to homicide, which rendered his confession involuntary. In *Baptiste*, police told the defendant that if he committed the armed robbery they were investigating with a BB gun and not a firearm then "'this is the time for you to tell us that' because 'it makes a world of difference.'" *Id.* at 504. When the defendant then asked why it made a difference, the officers told the defendant that if he used a BB gun to commit the robbery that it was attempted robbery and not armed robbery. *Id.* at 505. The defendant subsequently confessed and was charged with two counts of armed robbery with a deadly weapon. *Id.* On appeal,

this Court found that the officers misstated the law since using a BB gun can support a conviction for armed robbery. *Id*. at 506. Thus, the officers' promise that the defendant could not be charged with armed robbery if he confessed to using a BB gun rendered his subsequent confession involuntary. *Id*. at 507.

In this case, Lieutenant Harrison made no comparable statement. Harrison simply responded to Gaskey's statement with the accurate observation that his mindset during the commission of the crime is important to determining the punishment he faced. While Harrison's explanation may seem somewhat inapt to experienced criminal practitioners, it was nothing like the clearly erroneous legal explanation given by the officers in *Baptiste*. More importantly, "advis[ing] a suspect of potential penalties and consequences does not amount to a threat." *Martin*, 107 So. 3d at 305. Harrison simply informed Gaskey that his mindset during the incident would matter. As a result, Harrison did not make a misstatement of law.

In any event, Gaskey's confession was not causally connected to Harrison's statement. Immediately after Harrison's explanation about the different classifications of homicide, Gaskey stated that he would tell "the truth" if he could say it to Carroll. It was only after this response from Gaskey that Raley and Harrison told him that they would bring Carroll over, but that Gaskey would have to tell them the truth first. Based on Gaskey's obsession with Carroll throughout the interrogation, it is reasonable to assume that Gaskey was attempting to exploit Harrison's desire to know what occurred by demanding to see Carroll. Again, Gaskey made no statement indicating that he would say anything the officers wanted to hear. Gaskey stated that he would tell "the truth" in exchange for seeing Carroll. There is nothing to indicate that Gaskey confessed because of Harrison's explanation.

Gaskey's overture to police is similar to the facts in *Black v. State*, where both the defendant and his girlfriend were arrested after a police search of the defendant's home yielded marijuana in a dresser belonging to his girlfriend. 630 So. 2d 609, 614 (Fla. 1st DCA 1993). At the police station, the defendant became concerned over her well-being and "offered to provide details of

8

the robberies if [his girlfriend] was not charged for those offenses." *Id.* On appeal, this Court found the defendant's subsequent confession voluntary concluding that "there was no police overreaching [and] [i]nstead, the extraction of any 'promises' from the police was induced solely by overtures from the appellant, motivated by his concern for the welfare of his girlfriend." *Id.* at 617.

As in *Black*, Gaskey proposed the "offer" of telling police "the truth" in exchange for seeing Carroll. As a result, it cannot be said that Harrison misstated the law, made any promises, or otherwise induced Gaskey to confess.

V.

In conclusion, Gaskey waived his *Miranda* rights and voluntarily spoke to police. Gaskey's overriding concern throughout the interrogation was Carroll's well-being. At no point did Gaskey unequivocally invoke his right to silence or counsel. Furthermore, the interrogating officers did not misstate the law. Gaskey simply attempted to leverage his knowledge of the murders in order to see Carroll, and in the process confessed to the crime. As a result, Gaskey's confession was neither coerced nor involuntary. Accordingly, the trial court did not err in denying Gaskey's suppression motions. We, therefore, affirm his judgment and sentence.[2]

AFFIRMED.

B.L. THOMAS, C.J., and KELSEY, J., concur.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

---

[2] We reject all other arguments Gaskey makes in this appeal.

Andy Thomas, Public Defender, and Steven L. Seliger, Assistant Public Defender, and Barbara J. Busharis, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, Tallahassee, for Appellee.