FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D2023-1998
_____

DAQUAVION KEAMOS SNOWDEN,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Escambia County.
John F. Simon, Jr., Judge.


October 8, 2025


ON MOTION FOR REHEARING, REHEARING EN BANC,
CLARIFICATION, OR CERTIFICATION

PER CURIAM.

We deny the pending Motion for Rehearing, Clarification, or Certification, or Motion for Rehearing En Banc. On our own motion, we withdraw our opinion issued July 2, 2025, and substitute the following in its place to correct a scrivener's error.

Daquavion Snowden appeals his convictions for first-degree murder and attempted first-degree murder. Snowden raises one issue on appeal—whether the trial court erred in denying his motion to suppress statements made to police officers during his recorded interviews. Our review is based, in large part, on the

video recordings of interrogations, as well as two audio recordings taken during officer-accompanied smoke breaks—all admitted into evidence at his suppression hearing, and later at trial. Because the trial court erred in denying Snowden's motion to suppress statements made to officers after he unequivocally invoked his right to counsel, we reverse and remand for a new trial.

## *I. Facts*

In the early morning hours of July 1, 2021, Ladarius Clardy and Eric Young were driving to Young's home when a vehicle pulled up alongside them. The occupants drew weapons and opened fire, killing Clardy and leaving Young in critical condition. Snowden was taken into custody following execution of a search warrant at the registered address of the license plate on the vehicle used during the shooting. After his arrest, Snowden—shirtless and without shoes—was placed in an interview room, chained to a table, and told that investigators would interview him soon.

While waiting in the interview room, Snowden vomited on the floor. Officers entered and removed him so that the room could be cleaned. During his removal, the following exchange occurred between Snowden and one of the officers:

> SNOWDEN: *Is there any way I can talk to my lawyer or anything? This shit don't make sense.*
>
> OFFICER:   Like I said, we just got asked to move you, so an investigator will come talk to you, and they'll get you up to speed on what's going on.

(emphasis supplied). Officers returned Snowden to the room after several minutes. An hour later, two investigators entered the room.

Investigator Harris read the *Miranda*[*] warnings to Snowden, and Snowden confirmed he understood his rights. Neither the investigators nor Snowden discussed the waiver of his rights or the

---

[*] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

previous request for counsel. The investigators then interrogated Snowden. An hour into the interview, Snowden made a second request for counsel:

> HARRIS: [Y]ou're telling me that you're not involved in it, okay? So tell me more about you not being involved in it. Tell me more. . . . you want me to exonerate you. In other words, you want me to say that you don't have anything to do with this.

> SNOWDEN: I really don't.

> . . .

> HARRIS: So then in that case—help me. Help me explain that.

> SNOWDEN: *That's why I need a lawyer or something, dude, cause I don't know what to tell y'all.* . . . You know, I don't know what to tell y'all. What do I do? I don't got nothing to do with that shit. For real.

> HARRIS: Well, I mean, that's—

> SNOWDEN: I just drove that car before. That's the only reason my name ever came up. Cause someone seen me in that car before.

> HARRIS: Okay, but . . . to that point, that is your choice, but when you talk on the phone—okay. When you talk on the phone with people, right, all kinds of people, jail calls and everything else, we listen to all that stuff.

(Emphasis supplied). Investigators continued to interview Snowden. He then advised officers that he was under the influence of drugs.

Several minutes later, Snowden made his third request for an attorney, stating, "I need a lawyer." Investigator Harris acknowledged the request, asked if Snowden needed to use the restroom, and then left, Snowden meanwhile adding that he had

previously requested an attorney but was ignored. Snowden also requested clothes, complaining the interrogation room was cold and he was still shirtless and without shoes. Around three hours later, Snowden motioned for officers and asked for a smoke break.

Snowden was then escorted outside for a smoke break. During the break, an officer questioned Snowden about certain events related to the shooting and told him that he could talk. Snowden discussed the events of the shooting, stating he was not the shooter but was forced to drive the car. The officers never acknowledged Snowden's previous request for an attorney nor was he advised that his conversation during the smoke break was being recorded.

When Snowden was returned to the interview room, he fell asleep. Investigator Coxwell entered, woke Snowden up, and immediately asked him to swear to the truthfulness of his previous statements. Investigator Coxwell never mentioned that Snowden had previously invoked his right to counsel. Once Snowden complied, Investigator Coxwell abruptly left the room. Coxwell returned a few minutes later and advised Snowden that he would be charged as a principal to murder. He then advised Snowden that although he had requested an attorney, Snowden should let him know if he would like to keep talking to "minimize involvement" and that "mitigating factors" could be beneficial to his case. Snowden responded that he needed an attorney for help, and Coxwell left the room.

About fifteen minutes later, Snowden got the attention of an officer outside the room. He asked the officer if his request for an attorney resulted in him being charged as a principal to the crime. He was told that officers could no longer speak to him because he had invoked his right to counsel. Snowden then asked for Investigator Harris. Investigators Harris and Coxwell re-entered and re-read Snowden his *Miranda* rights. Snowden said that he understood his rights but was not asked if he waived them nor did they provide him with a waiver form. The investigators then questioned Snowden about the drive-by shooting and statements he made during the first round of questioning.

About several hours of questioning, Snowden was taken outside for a second smoke break. During the break, Snowden

4

discussed with the escorting officer the events of the shooting and those involved. Again, the discussion was recorded.

Officers returned Snowden to the interrogation room, and he fell asleep. Officers later returned, and questioning resumed. Thirteen hours elapsed between the time Snowden was initially placed in the interrogation room and the conclusion of the interrogation.

*Suppression Hearing*

Prior to trial, Snowden's counsel moved to suppress all statements made to police on the day of his arrest. At the suppression hearing, defense counsel questioned Investigator Harris regarding Snowden's first request for an attorney made to an officer when Snowden was removed from the room after he had vomited. Investigator Harris testified that he was unaware that Snowden had made the initial request but reviewed the video and concluded that the invocation was still not a "specific request" for an attorney. He described the invocation as conditional, a statement akin to "May I speak to an attorney?" or "Is it possible for me to speak to my attorney?" He confirmed that Snowden told him during the interrogation that he was under the influence of drugs, specifically Xanax.

The State called as a witness the officer who accompanied Snowden on the two smoke breaks. He confirmed he spoke with Snowden during the breaks and recorded their discussions. He did not know if Snowden had invoked his right to counsel before the breaks, and he did not advise Snowden of his *Miranda* rights before talking to him. He acknowledged that he asked Snowden questions about his involvement in the shooting.

Defense counsel argued that Snowden had twice unequivocally invoked his right to counsel before the investigators acknowledged his third request and left the interview room. Specifically, counsel argued that law enforcement improperly interviewed Snowden following his first request, continued to ignore him following his second request, and that any statements made following his third request were inadmissible because his previous invocations were not honored, and Snowden did not waive

5

the invoked right. Additionally, the officers knew that Snowden was under the influence of drugs. The State responded that neither the first nor second invocation was unequivocal and, even if one or both were unequivocal, that Snowden reinitiated communication with the officers and waived his right to counsel, rendering his later statements admissible. The trial court denied the motion to suppress. The trial judge concluded that Snowden was coherent in the video footage and freely and voluntarily waived his *Miranda* rights. He found the first and second requests for an attorney were equivocal. That said, he found the third request for an attorney to be clear, but that Snowden then reinitiated and waived the right.

### *Trial*

The recordings of the interrogations and smoke breaks were played during trial, and transcripts were provided to the jury. The jury found Snowden guilty of first-degree murder and attempted first-degree murder. This is Snowden's timely appeal.

### *II. Analysis*

"[A] suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues, and the proper standard of review depends on the nature of the ruling in each case." *State v. Glatzmayer*, 789 So. 2d 297, 301 (Fla. 2001) (internal footnotes omitted). Such rulings present mixed questions of fact and law. *See, e.g., Gaskey v. State*, 270 So. 3d 1276, 1278 (Fla. 1st DCA 2019). Thus, we review the trial court's factual findings for competent, substantial evidence, and questions of law are subject to de novo review. *See, e.g., id.* The factual findings at issue here are largely based on the video and audio recordings of Snowden's interactions with law enforcement in the interview room and on break. "Because we have equal access to the video, we apply a less deferential standard to the trial court's factual findings to the extent that they are based on the video." *Thomas v. State*, 351 So. 3d 197, 204 (Fla. 1st DCA 2022).

In *Miranda*, the Supreme Court recognized that a suspect's right to remain silent extends to custodial interrogations. *See* 384 U.S. at 467–68. The Supreme Court also has held "that a suspect subject to custodial interrogation has the right to consult with an

6

attorney and to have counsel present during questioning." *Davis v. United States*, 512 U.S. 452, 457 (1994) (explaining that *Miranda* recognized this prophylactic right). "The right to counsel established in *Miranda* was one of a series of recommended 'procedural safeguards' that were not themselves rights protected by the Constitution but were instead measures to [e]nsure that the right against compulsory self-incrimination was protected." *Id.* (internal quotation, citation, and other marks omitted). So "[i]f . . . [the suspect] indicates *in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking *there can be no questioning*." *Miranda*, 384 U.S. at 444–45 (emphases supplied).

But "the suspect must *unambiguously* request counsel." *Davis*, 512 U.S. at 459 (emphasis supplied). "[H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* "If the statement fails to meet the requisite level of clarity," there is no requirement that "officers stop questioning the suspect." *Id.* While the "police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation," they need not stop questioning when an "ambiguous or equivocal reference to an attorney" leaves officers unclear "whether or not the suspect wants a lawyer," or when a "reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Id.* at 459–60; *see also State v. Owen*, 696 So. 2d 715, 719 (Fla. 1997) (following *Davis* and holding that questioning does not need to stop "if a defendant who has received proper *Miranda* warnings makes only an equivocal or ambiguous request to terminate an interrogation"). We are required "to determine whether the accused actually invoked his right to counsel," and "this is an objective inquiry," one necessitating "some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance." *Davis*, 512 U.S. at 452. And "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100 (1984).

7

Thus, the initial question is whether Snowden *unambiguously* requested the presence of counsel and then, if so, when. We conclude that he unequivocally invoked this right at the inception of the interrogation.

*First Request for An Attorney*

It is undisputed that Snowden was in custody at the time he made his first request—he was shackled to a table in the interrogation room and was told investigators would be with him at some point. After Snowden vomited on the floor and an officer told Snowden that he would be removed so the room could be cleaned, he asked, "Is there any way I can talk to my lawyer or anything?" Without question, the officer understood the statement because that officer responded and said that an investigator would be in shortly to get him "up to speed on what's going on." Our review then narrows to the substance and context of the statement.

The State argued, and the trial court accepted, that the tacking on of the phrase "or anything" renders ambiguous Snowden's preceding request for an attorney. Without that phrase, the request is unambiguous. We disagree that "or anything" could cast doubt on the meaning of Snowden's request for a lawyer. "[A] suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459 (internal citations and quotations omitted). While Snowden's request was less conventional than "I want a lawyer," the addition of "or anything" does not change the meaning of the request made or the context in which it was uttered. Courts have upheld similar requests containing filler phrases as clear and unambiguous. *See Wilder v. State*, 40 So. 3d 804, 809 (Fla. 1st DCA 2010) (finding the statement "I would rather not even talk unless I had an attorney present" to be an unequivocal request for counsel); *see also Smith*, 469 U.S. at 96–97 (finding the suspect's response "Uh, yeah I'd like to do that" when asked if he understood that he could have his attorney present to be an unambiguous request for counsel); *State v. Soto*, 954 So. 2d 686, 688 (Fla. 4th DCA 2007) (holding a suspect's question "I can't make a phone call or nothing, no?" to be a clear and unambiguous request for

counsel); *Bean v. State*, 752 So. 2d 644, 646 (Fla. 5th DCA 2000) (viewing the statement "I feel that I should be able to talk to a lawyer" to be an unequivocal request in its context).

The Florida Supreme Court requires that law enforcement officers exercise "common sense" when their duties necessarily conflict with constitutional rights. It clarified as follows:

> [I]f, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwise—i.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspect—is to actively promote the very coercion that *Traylor* was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State.

*Almeida v. State*, 737 So. 2d 520, 525 (Fla. 1999).

Here, Snowden's statement was a clear request for counsel. Alternatively, if the officer considered the statement to be a question (Can I get a lawyer or something), the officer should have responded accordingly. Because the officer understood Snowden's request such that he directly responded to it, common sense would require that the officer respond accordingly and communicate the request to interrogating officers to allow Snowden to contact counsel rather than dismiss or ignore his request. Because we find Snowden's first request to be unequivocal, all later statements made during his interrogation, including the smoke breaks, should have been suppressed.

9

*Second Request for An Attorney*

Even if we determined that Snowden's first inquiry about an attorney was ambiguous, the second request was unequivocal. About two hours after arriving at the police station, Snowden made the second request for an attorney stating, "That's why I need a lawyer or something, dude, cause I don't know what to tell y'all. . . . You know, I don't know what to tell y'all. What do I do? I don't got nothing to do with that shit. For real." Though Snowden followed his request by disclaiming any participation in the crimes alleged, we also find this invocation to be clear. That the statement was not a direct assertion, but an indirect comment does not render it ambiguous. A reasonable officer in similar circumstances would understand "That's why I need a lawyer or something" to be a clear request for an attorney given the context. *See Wilson v. State,* 274 So. 3d 549, 552 (Fla. 5th DCA 2019) (finding the suspect's statement, "I need a lawyer, man," to be a clear and unambiguous request for counsel); *Daniel v. State*, 238 So. 3d 1283, 1285 (Fla. 5th DCA 2018) (finding "Look, can I have a lawyer, man, 'cause y'all is tryin' to confuse me and I know what I think and I know what I see" to be an unequivocal request for counsel). Snowden asked for his attorney, repeatedly expressed confusion, and investigators understood and acknowledged his statement but did not respond to or honor his request. Within fifteen minutes of this request, Snowden told investigators he felt uncomfortable and was under the influence of drugs. He was not questioned about whether the drug use inhibited his ability to understand or make decisions.

*Third Request for An Attorney*

The State contends that regardless of whether the first or second request for counsel was unequivocal, Snowden reinitiated contact, waived his right to counsel, and so his later statements related to the shooting were admissible. Hours into the interrogation, Snowden said, "I need a lawyer." At that point, the investigators acknowledged the request and left the room. Snowden was advised that he was being charged as a principal to the crimes. Sometime later, Snowden asked an officer if he was being charged as a principal because he asked for an attorney and was told in response that he would have to talk to the investigators. Snowden then asked to speak with the investigators.

10

The Florida Supreme Court set forth a clear standard to be applied when waiver of an invoked *Miranda* right is at issue: "(1) did the suspect reinitiate contact with police and, if so, (2) did he knowingly and voluntarily waive his earlier-invoked *Miranda* rights." *State v. Penna*, 385 So. 3d 595, 602 (Fla. 2024); *see also Ramirez v. State*, 739 So. 2d 568, 575 (Fla. 1999) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (internal quotations omitted)).

To the first prong: "[O]nce an individual has invoked the *Miranda* right to counsel, a valid waiver of this right can be found only if the individual is the one responsible for reinitiating contact with the police." *Sapp v. State*, 690 So. 2d 581, 584 (Fla. 1997); *see also Traylor v. State*, 596 So. 2d 957, 966 (Fla. 1992) ("[T]he suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel."). A suspect who has invoked a *Miranda* right must not be subject "to any words or actions on part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1983). This includes when a suspect requests counsel. *See Cuervo v. State*, 967 So. 2d 155 (Fla. 2007). The underlying danger inherent to continued contact between law enforcement and a suspect who has invoked his right to counsel is coercion, either direct or as a practical consequence of continued contact. *See Arizona v. Roberson*, 486 U.S. 675, 686 (1988) ("[T]o a suspect who has . . . request[ed] counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling."); *Scotsman v. State*, 238 So. 3d 300, 305 (Fla. 4th DCA 2018) (holding that the failure to honor a suspect's request for counsel taints later incriminating statements because a suspect's decision to reinitiate contact may be a product of coercive tactics). To this end, the admissibility of statements made after the suspect reinitiates communication and waives an invoked right depends on "whether his 'right to cut off questioning' was 'scrupulously honored.'" *Cuervo*, 967 So. 2d at 161 (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)); *see also Almeida*, 737 So. 2d at 526.

In *Scotsman*, the suspect requested counsel, but detectives continued to discuss the evidence against the suspect and interrogate him. 238 So. 3d at 302. Before leaving the interview room, a detective suggested that the suspect should talk to law enforcement before other individuals gave their story first and that the suspect would likely not be released any time soon if he does not offer up his story. *Id.* The suspect was then left alone in the room for several hours and later shuffled to another room; during this waiting period, officers again told the suspect that he would be charged, but they could not speak with him. *Id.* On appeal, the Fourth District found it pivotal that investigators continued contact with the suspect after he requested counsel, determining that the officers' persistent questioning and deceptive comments exerted a coercive influence on the suspect, ultimately leading to the waiver of his request. *Id.* at 304–05.

Here, four hours after being placed in an interview room, Snowden made a third, unequivocal request for counsel, and investigators left the room. After the third request, Investigator Coxwell told Snowden he would be charged as a principal to murder and when Snowden protested, the investigator responded, "[Y]ou've requested an attorney, but . . . there may be some things that you say that could help yourself out, but I can't do that because you requested an attorney." Investigator Coxwell again left the room, and minutes later, Snowden requested the investigators come back and talk to him. Investigators Harris and Coxwell returned to the interview room, read Snowden his *Miranda* rights, and Snowden agreed that he understood his rights. Snowden provided statements about the shooting, and the investigators questioned Snowden, rehashing and revisiting his prior statements.

One must consider, under the totality of the circumstances, that at the time Snowden asked to speak with investigators (when the State argues he reinitiated contact and waived *Miranda* rights), he had "spilled the beans" three previous times despite having made multiple requests for an attorney. It is unreasonable to ignore the entire timeline of events and deny the impact on his decision to call the investigators back to speak with him. Furthermore, just before Snowden asked to re-engage with investigators, Investigator Coxwell acknowledges Snowden's

12

request for an attorney, but that Snowden needed to let him know if he would like to continue talking. Snowden complained that even if he chose to talk with investigators again that he would still go to jail, and Investigator Coxwell responded, "Yeah, but you could also minimize your involvement" and that "there might be mitigating factors to it."

Based on the totality of the circumstances, including the conduct of the investigators and their interactions with Snowden before and after he thrice invoked his right to counsel, we conclude that Snowden's decision to reinitiate contact with detectives was a result of improper coercive tactics by law enforcement. Though Snowden was periodically left in the interview room for several hours, he did not actively reinitiate contact. Investigators and officers continued to make statements to him about the case. We find that Snowden's attempts to re-engage with law enforcement were directly related to investigators' repeated contact and statements to him.

The State argues affirmance is supported by this Court's decision in *State v. Denson*, 387 So. 3d 466 (Fla. 1st DCA 2024). We cannot agree. In *Denson*, Denson was arrested, police officers read him his *Miranda* warnings, he waived these rights, he was interrogated, and he confessed to murder. 387 So. 3d at 468. Before his confession, Denson "softly stated, 'Listen man, 'cause it don't matter, shit, 'cause I feel like I'm being tricked into it. I just don't want to say nothing, you feel me? . . . I'm stuck with all this." *Id.* The officer responded that all he wanted to know was what happened. *Id.* Denson continued to talk and made incriminating statements which he then sought to suppress. *Id.* The trial court granted his motion to suppress, and the State appealed. *Id.*

*Denson* concerned the invocation of the right to remain silent. Where a suspect chooses to remain silent, the interrogation may only resume when the suspect waives the invoked right. But if a suspect subject to custodial interrogation indicates that he wants the assistance of an attorney, law enforcement must immediately stop the interrogation *until an attorney is present* or the right is waived. *See Penna*, 385 So. 3d at 600.

On appeal, this Court considered whether Denson made an unequivocal invocation of his right to remain silent, a factual distinction from the invoked right at-issue here. In resolving that issue, this Court concluded that Denson's statement was a "one-off . . . that did not clearly suggest that he wished to discontinue the entire interview." *Denson,* 387 So. 3d at 471. This Court noted that Denson did not make the at-issue statement at the beginning of substantive questioning or when asked whether he wished to talk, and he "did not make repeated statements or clear desires to stop the discussion entirely." *Id.* Further, Denson was not subject to repeated efforts to coax him to change his mind and continue to talk. *Id.* This Court characterized Denson's statement as "soft-spoken," "sandwiched" between other statements indicating equivocality, and "essentially mumbled." *Id.* Further, this Court noted that Denson "immediately proceeded to talk without the officer's prompting after" he made the at-issue statement, an indication that "he did not intend to make a blanket invocation." *Id.*

Here, Snowden faced relentless pressure to continue discussing the case. Despite making three unequivocal requests for counsel, investigators and officers repeatedly discussed the case with Snowden, continued questioning him after acknowledging his third request, and placed him in an interrogation room for thirteen hours.

### III. Conclusion

The right to counsel means the defendant is entitled to have an attorney present during further questioning. Because Snowden made three unequivocal requests for counsel which were ignored, his reinitiation of contact with officers and readministering of *Miranda* rights does not cure the failure to scrupulously honor his requests. Snowden's statements should have been suppressed, and we cannot say that the trial court's erroneous admission of his inculpatory statements at trial was harmless. *See State v. DiGuilio*, 491 So. 2d 1129, 1125 (Fla. 1986) (explaining that the harmless error rule functions to conserve judicial labor while providing an "equal degree of protection for the constitutional right to a fair trial, free of harmful error"). We note at all events that the

14

State has not argued otherwise on appeal. Thus, we reverse the judgment and remand for a new trial consistent with our holding.

REVERSED and REMANDED.

M.K. THOMAS, NORDBY, and TANENBAUM, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Jessica J. Yeary, Public Defender, and Richard M. Bracey, III, Assistant Public Defender, Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Daren L. Shippy, Assistant Attorney General, Tallahassee, for Appellee.